ELISHA MILLS *et al.*

*v.*

RALPH LOCKWOOD

1. NOTICE — *by recital of prior conveyance in a deed.* Where a party holds a conveyance for land, and there is a misdescription of the premises therein, and, on conveying to another by deed in which the premises are correctly described, he recites the lands were the same conveyed to him by deed from his grantor, naming him, this second deed being upon record, it is notice to the heirs of the first grantor that his grantee claimed title from him, by force of his deed to the lands as described in the second conveyance.

2. REFORMING AN INSTRUMENT — *only in a clear case.* To justify a court of chancery in reforming a deed, the evidence of the mistake must be clear and convincing. Correcting mistakes is a matter of discretion in the court, but not to be exercised without the strongest and most satisfactory evidence of its justice.

3.  But on full proof of a mistake, an equity arises in favor of the party affected by it, which the court is bound to protect, if protection can be afforded without injury to innocent purchasers, without notice of the mistake.

4.  And a party who seeks, through the aid of a court of chancery, the correction of a deed to an antecedent holder of the title to land, for a mistake in the description of the premises, ought not to be prejudiced in his claim to relief, because, before filing his bill, he sought to defend an action of ejectment for the premises, under title derived by other means than through the deed complained of.

5.  ESTOPPEL.  Nor should the party seeking such relief be estopped therefrom, because his grantor, while holding a deed in the regular chain of title, as administrator of the grantor who had made the deed sought to be reformed, presented his petition to the county court for a sale of the premises to pay debts, alleging therein that his intestate was seized of the lands at the time of his death, and obtaining an order of sale accordingly, the party asking the equitable relief not concurring in such proceeding.

6.  Or even if he had concurred therein, and the proceedings in the county court were void, an estoppel would not be created.  If they were void, they could not operate as an estoppel upon any party.

7.  LACHES — LIMITATION — *against whom they may be alleged.*  It is not understood that a statute of limitation or rule of limitation in equity runs against a possessor of real estate, but it runs against him who is out of possession.

8.  So, laches cannot be imputed to one in the peaceable and undisturbed possession of land, for delay in resorting to a court of equity to correct a mistake in the description of the premises in one of the conveyances through which his title must be deduced.

9.  In this case the deed which contained the misdescription of the premises, was made in March, 1841.  A remote grantor obtained a deed in February, 1858, and went into possession, which he held undisturbed, until about June, 1863, when the heirs of the grantor who made the deed in 1841, brought ejectment against him, and recovered, the party in possession seeking on the trial to defend under title derived through a sale of the land by the administrator of the plaintiffs' ancestor.  On error, that judgment in ejectment was affirmed.  The defendant in ejectment then took a new trial under the statute, and filed his bill to correct the mistake in the deed of 1841.  The bill was entertained and the relief granted, notwithstanding the objection that the complainant was guilty of *laches* in not seeking the correction at an earlier day.

APPEAL from the Circuit Court of Marshall county; the Hon. S. L. RICHMOND, Judge, presiding.

The opinion of the court contains a statement of the case.

Messrs. M. WILLIAMSON, McCoy & FLEMING and OLIVER C. GRAY, for the appellants.

Messrs. BANGS & SHAW, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was a bill in chancery, exhibited in the Marshall Circuit Court by Ralph Lockwood against Elisha S. Mills and others, to reform a deed and to enjoin proceedings in an action of ejectment, brought by the defendants against the complainant.

The plaintiffs in ejectment claimed the lands in controversy as heirs at law of Cephas Mills, deceased. The defendant therein claimed as a remote grantee of Joseph D. Beers, who, it was alleged, had a "tax title" for the premises. He also claimed under conveyance from W. B. Green, who, as administrator of Cephas Mills, had obtained an order of the County Court, and sold and conveyed the lands to one Parker, who sold to Green, and who sold and conveyed to Lockwood, the defendant. The lands were described as being in range one west of the third principal meridian.

Defects being found, in both these claims of title, a verdict passed for the plaintiffs, on which judgment was rendered, and the same was affirmed by this court.

On the trial, Lockwood made no other claim to the lands than as above stated. Beers, July 16, 1856, sold and conveyed the lands in dispute to W. B. Green, the sale being made by Phelps and Bowland, Beers' agents.

Cephas Mills, in his life-time, had been connected with Beers in a large business, and had become indebted to him in about seventy-five thousand dollars, and, on the 29th of March, 1841, made a deed of all his lands in Marshall county to Beers, in part satisfaction of Beers' claims on him. In this deed the lands are described as being in range two west of the third meridian. Mills owned the lands in one west, by deed from Lyon, James and Harris, dated June 3, 1837, which he delivered over to Beers when he sold to him, it being then unrecorded. On the same day, March 29, 1841, Mills executed a deed to one

8 — 42D ILL.

Martin, for all the lands he owned in Illinois not included in the deed to Beers. This deed is for two " eighties," viz. : S. ½ of N. E. 23 and E. ½ N. W. 26, in range two west.

Silas Ramsay, being agent for Beers to pay taxes on lands claimed by him, paid the taxes on these lands in one west for Beers, commencing in 1845, and in 1848, at a sale for taxes, bid them off in the name of Beers, and a tax deed was executed to him.

Phelps and Bowland, having been agents for Beers to pay taxes, take charge of his lands and negotiate sales, sold the lands in controversy, as such agents, to W. B. Green, to whom Joseph D. Beers executed a deed in July, 1856; and Green conveyed to Lockwood by deed dated February 22, 1858. Beers sent to his agents, Mills' deed to him, and Lyon, James and Harris' deed to Mills ; the last of which properly described the lands as in one west, while the former described them as in two west. When Green first made the contract with Beers, he says there was nothing included but the tax title, but Beers gave him a note dated in 1837, executed by Cephas Mills to John E. Mills for twenty-five hundred dollars, for the purpose of filing the same against the estate of Cephas Mills, on which Green was about to administer. He did administer, and filed this note as a claim against the estate of Cephas Mills, and presented his petition to the County Court for an order to sell these lands to pay this debt. This was in 1856, and, an order of sale having been granted, the lands were sold, and one Parker became the purchaser, who received a deed from Green, the administrator, and then reconveyed to Green, and Green thereafter conveyed to Lockwood.

These proceedings being adjudged by this court as fraudulent, on the authority of the case of *Baker's Heirs* v. *Langworthy*, 23 Ill. 484, and as conferring no title on the purchasers (*Lockwood* v. *Mills et al.*, decided April Term, 1864),* Lockwood, having taken a new trial under the statute, filed this bill in chancery to stay the proceedings in ejectment, and to reform

the deed from Cephas Mills to Beers, on the allegation that Mills owned and intended to convey to Beers lands in one west, being lands he then owned, having on the same day sold to Martin two eighties in two west, which included all the lands he owned in this State not embraced in his deed to Beers.

Immediately on the purchase by Lockwood, he took possession of the premises, paid the taxes, and made lasting and valuable improvements thereon. The heirs of Mills never paid any taxes on them, or set up any claim to them until they commenced their action of ejectment.

The answer of defendants denies the sale by Cephas Mills of any lands in one west, and holds complainant to the deed and to the lands described in it, and insists that all the title Green bought from Beers to the lands in one west was no other than such title as Beers might have acquired under the sale and purchase for taxes. The lands were vacant, and were unimproved when Lockwood took possession.

The defendants in their answer allege that Lockwood, at no time prior to filing this bill, claimed title through Beers, or claimed that there was any mistake in Mills' deed to Beers, but always insisted upon the title obtained under the sale by Green as administrator, and they insist that he is estopped by the allegation in the petition for the order of sale, that " Mills died seized of these lands."

And they also insist, that, in the purchase by Green of Beers' title through Beers' agents, Phelps and Bowland, they sold and he purchased only a tax title, and that was all Green sold to Lockwood.

And they insist also, that the fraudulent attempt to get the title to these lands, through the proceedings of the County Court, set on foot by Green the administrator, in which Lockwood was a participant, should debar him of all relief in a court of equity.

There are other matters urged by the appellants against complainant's right to relief, but these are the most material.

Green does state, in his testimony, that he purchased but a tax title from Phelps and Bowland, the agents of Beers; but he

also states, that the land, at that day, with a perfect title, was worth about three dollars per acre, and he paid fourteen hundred for the title he obtained. There being but three quarter sections purchased, in all four hundred and eighty acres, their full value, with a perfect title, at three dollars per acre, would be fourteen hundred and forty dollars, but forty dollars more than Green swears he paid for them. This is a strong fact to show that he was buying a perfect title, for he paid the value of such a title. Besides, both Phelps and Bowland testify, that they sold to Green a perfect title ; they state they sold the title Beers derived from Cephas Mills, and that they relied on no other title. And Beers' deed to Green recites that the lands were the same lands conveyed by Mills and wife to him by deed. This deed being on record was notice to the heirs that Beers claimed title from Mills by force of his deed. The evidence is conclusive, that Green bought of Beers all the title he had, as well that derived from Mills' deed as that derived from the tax deed.

The evidence shows that Beers had been a benefactor of Mills on a large scale, and that Mills, when he made the deed for these lands, was indebted to Beers more than $70,000, which Mills was extremely anxious to settle, and he accordingly made this deed for the purpose of discharging his indebtedness. Mills acted like an honest man, and in good faith intended to convey to Beers, lands which he really owned, not lands which he did not own and to which he had no claim. That would not have been honest and fair, and Mills appears to have been an honest and conscientious man, feeling deeply the great obligations he was under to Beers, and manifesting the greatest solicitude to discharge them if possible. Such a man, for such a purpose, having such a laudable object in view, would not make, intentionally, a deed to lands he did not own.

Mills, when he conveyed to Beers, delivered to him his title paper received from his grantors, Lyons, James and Harris, which had not then been recorded, and Beers put it on record in 1852. Why did Mills part with this deed, unrecorded as it was, if he did not sell the lands described in it to Beers? Can

this be explained? It was this record, which disclosed the fact to the heirs of Mills, that their father once had title to these lands in one west, and his deed to Beers being for lands in two west, the title to the first named lands was in them, hence the ejectment suit, and hence this application by bill in chancery to correct the mistake.

To justify a court of chancery in reforming a deed, it is held by this court, the evidence of the mistake must be clear and convincing. *Broadwell et al.* v. *Thompson et ux.*, 1 Gilm. 599; *Hunter, Admr.*, v. *Bilyeu et al.*, 30 Ill. 220.

In this last case it was said, correcting mistakes was a matter of discretion in the court, but not to be exercised without the strongest and most convincing evidence of its justice.

We have examined this record carefully, and are convinced, a mistake occurred in describing these lands as in range two west, a mistake a scrivener with a plat before him would be likely to make, as the ranges are on the same plane, and the eye might easily mistake one range for the other. All the material facts conspire to show a mistake, and Beers' promulgation of it, by having the deed from Mills to him placed on record giving the true location, goes far to show the mistake was honestly made and not concealed. Mills intended to convey to Beers, only such lands as he owned, and, in so doing, conveyed lands he did not own, and at the same time delivered up the title papers for the lands he really did own. This cannot be satisfactorily accounted for, and has not been, on any other sensible hypothesis than the mistake of the scrivener who drew the deed.

Cases of this kind are by no means rare in courts of justice. One directly in point is found in 3d Smeed and Marshal's reports (Miss.) *Simmons* v. *North*, page 67.

The case was this: North, being indebted to Simmons & Co., in the sum of twelve hundred dollars, to secure the payment, executed a deed of trust on the north-east quarter of section 33 in township 19 of range 7 east, which was duly acknowledged and recorded. In this quarter, North had no interest whatever, but had in the south-east quarter on which

he lived. After the discovery of the mistake, North gave a power of attorney to the trustee to rectify it, which was duly recorded. Judgments were obtained against North after the execution of the deed of trust and before the discovery of the mistake, on which executions were issued and levied on this south-east quarter, which was sold by the sheriff and bought by one Kennedy who afterward conveyed the same to one Lindsey. On the day of the sheriff's sale the trustees attended and made proclamation of the facts on the ground, and warned all persons from buying. The court held that equity would take jurisdiction, order the mistake in the deed of trust to be corrected, and the sheriff's deed to be given up and canceled. Here was a case of subsequent purchasers for value. In the case before us, there are no persons standing in that relation. There are no rights of that character interposed, and none to be inequitably affected by a correction of the mistake. The heirs at law of Cephas Mills stand in his shoes, and whatever should be decreed against him if living, will be decreed against his personal representatives.

Cephas Mills is not here to admit the mistake, but it is proved satisfactorily by all the circumstances of the case. An equity, then, has sprung up in favor of the complainant, which this court is bound to protect, if protection can be afforded without injury to innocent purchasers, without notice of the mistake. The fact that the purchasers had notice of this equity, by the proclamation of the trustee, makes the case no stronger than this, for the defendants do not occupy the position of purchasers to be affected by notice. A similar case may be found in 6 Paige's Chancery Reports, 347, *Gouverneur* v. *Titus.*

There would be a great defect in the law, if a court of equity had no power to correct such mistakes on full proof.

On the point of *laches*, in not resorting to this remedy at an earlier period, the answer is, the statute of limitations has not run against the complainant, and he has been, all the time since his purchase, in the peaceable possession of the lands. He was in no position to act; he could only be quiet, awaiting

the attack of those who supposed they had paramount title.
In such case, the lapse of time is not material. So soon as the
heirs at law of Cephas Mills brought their action of ejectment,
and recovered a verdict, then complainant filed this bill alleg-
ing the mistake and seeking to correct it. He had no motive
to move before he was molested. If there be any *laches,* is it
not rather imputable to the heirs, who slumbered on their
rights, if they had any, so many years? It is not understood
that a statute of limitations, or rule of limitation in equity,
runs against a possessor of real estate, but it runs against
him who is out of possession. *Barbour* v. *Whitlock,* 4 Monroe,
197.

The case of *Lindsay* v. *Davenport,* 18 Ill. 381, is like this,
only that the mistake was corrected in favor of the grantor
after the lapse of twenty-two years, he all the time having
remained in possession of the tract he had by mistake included
in his deed, and no rights of third parties had intervened.

The question of estoppel by reason of the proceedings of
Green to obtain an order of sale, wherein he alleged in his
petition that Mills was seized of these lands at his death, can-
not operate against the complainant, as it was no act of his,
and his concurrence is not shown, and if it was, the proceed-
ings of that court were held by this court to be void. *Lock-
wood* v. *Mills et al.,* decided April Term, 1864. If they were
void it is not perceived how they could operate as an estoppel
upon any party.

As to a want of proper parties, Beers had conveyed to
Green all the title he had, and we see no others outside, who
could be affected by this proceeding who are not before the
court.

We are of opinion the case is a plain case of mistake, of
which the heirs of Mills unjustly seek to take advantage.
Their ancestor intended to convey these lands to Beers and
not other lands. Of this the proof is to us plain and con-
vincing. The court did not err in decreeing a correction of
the mistake, and we affirm the decree. The several attempts
of complainant, to protect himself under the tax title, and the

administrator's deed, were but *tabula in naufragio*, and ought not to prejudice any honest right he may be able to establish, and we think has satisfactorily established.

The decree must be affirmed.

*Decree affirmed.*