Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company, Appellee, v. City of Chicago, Appellant.

Gen. No. 4,625.

1. CHANGE OF VENUE—*propriety of granting, from one county to another.* A petition for a change from one county to another is addressed to the sound discretion of the court; the ·propriety of the granting or refusing the change should not be determined necessarily with the side presenting the greater number of affidavits.

2. CHANGE OF VENUE—*how question of propriety of, saved for review.* Where a change has been granted from one county to another the propriety of the change should be preserved by a motion to remand with an exception, if such motion to remand, is overruled.

3. PRACTICE—*what not reached by motion in arrest.* A judgment after verdict can only be arrested for substantial faults. All defects which would not have been fatal on a general demurrer are cured by pleading to the issue, and are aided by verdict. When the pleading states the essential requisites of a cause of action, the court will presume that the particular fact or circumstance which appears to be defectively or imperfectly stated or omitted was proved at the trial. A defective or inaccurate statement of a cause of action is cured by a general verdict but where no cause of action is stated a verdict will not cure the defect.

4. PLEADING—*what sufficient allegation of ownership.* After verdict averments that "plaintiff was possessed as of its own property" and "the property of the plaintiff was destroyed or injured," amount to an allegation of ownership by the plaintiff.

5. PLEADING—*when venue sufficiently alleged.* In an action under the statute rendering cities, etc. liable for the loss of property from mob violence, the location of the mob which destroyed the property is sufficiently set up by an averment that "within the territorial limits of the city of Chicago, aforesaid, in consequence

294 APPELLATE COURTS OF ILLINOIS.

P., C., C. & St. L. Ry. Co. v. City of Chicago, 144 App. 293.

of a certain mob or mobs, riot or riots, each of which was then and there composed of twelve or more persons within the territorial limits of said city of Chicago, a large quantity" etc.

6. CITIES, VILLAGES AND TOWNS—*when notice under statute concerning loss of property through mobs sufficient.* A notice in the language of the statute which renders cities liable for the property of citizens destroyed through mob violence, is sufficient which has attached a schedule describing the property in detail, and whether destroyed or injured, the place of loss, the date of the loss, and the amount of damage to each item of property, and which was served by the solicitor for the party suffering the loss upon the mayor of the city claimed to be liable, by handing to him a true copy thereof within the time fixed by statute.

7. CITIES, VILLAGES AND TOWNS—*what not competent against city.* In an action against a city to recover for property alleged to have been destroyed through mob violence, a dispatch by the mayor of the city to the governor of the state describing conditions and asking for troops, prepared by the legal department of such city, is not a part of the *res gestæ* and is not competent against the city.

. 8. EVIDENCE—*what not part of res gestæ.* Declarations to be *res gestæ* must be spontaneous and not statements which are deliberate and prepared for a purpose.

9. APPEALS AND ERRORS—*when affirmance is by operation of law.* Where there are but two justices acting in a cause and they are unable to agree whether the case should be affirmed or reversed, it is affirmed by operation of law.

Action in case. Appeal from the Circuit Court of DuPage county; the Hon. ARTHUR H. FROST, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed November 20, 1908.

THOMAS J. SUTHERLAND, for appellant; EDWARD J. BRUNDAGE, STEPHEN S. GREGORY and CHARLES WAYNE, of counsel.

LOESCH, SCOFIELD & LOESCH, for appellee; L. C. COOPER and CHARLES J. SCOFIELD, of counsel.

MR. PRESIDING JUSTICE THOMPSON delivered the opinion of the court.

This is an action in case begun the 16th day of May, 1895, in the Circuit Court of Cook county, Illinois, by

the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company against the city of Chicago to recover three fourths of the damages sustained by it on account of the destruction of property of which "the plaintiff was possessed as of its own property," during riots there in July, 1894.

The declaration avers that the plaintiff is a corporation of the state of Illinois and other states; that the defendant is a municipal corporation of said state; that on July 6, 1894, plaintiff was a common carrier of freight and passengers over a line of railroad leading from the city of Pittsburgh in the state of Pennsylvania to the southern boundary of the city of Chicago, at a point near the intersection of Western avenue with said southern boundary line, thence northerly within the limits of the city of Chicago across various streets to near Canal street; that "plaintiff was possessed as of its own property of a large quantity of railway equipment, supplies, goods, merchandise and property," describing in detail a large amount of property consisting of railway equipment of various kinds and merchandise of the value of, to wit, $500,000, and particularizing the extent and places of loss; that on, to wit, the day and year aforesaid, and within the territorial limits of the city of Chicago aforesaid, in consequence of a certain mob or mobs, riot or riots, each of which was composed of twelve or more persons within the territorial limits of said city, a large quantity, to wit, all the above described equipment and property, was destroyed, to wit, etc.; that the said property, goods, etc., at the time of said injury were not in transit; that said injury and destruction were not occasioned or in any way aided, sanctioned or permitted by any carelessness, neglect or wrongful act on the part of the plaintiff, or through any neglect on the part of the plaintiff to use reasonable diligence to prevent said injury and destruction. It is further averred that the plaintiff within thirty days after said injury

and destruction of said property, to wit, on August 6, 1894, gave due notice to said defendant of said injury and destruction and then and there demanded payment of three-fourths of the amount of said loss and damages, to wit, $337,268.25, whereby and by reason of the premises, and by force of the statute in such case provided, it became and was the duty of said defendant to pay to said plaintiff the sum of $337,-268.25, etc. The defendant did not demur to the declaration but filed the general issue.

In August, 1904, the plaintiff applied for a change of venue from Cook county because of the prejudice of the people. An order granting a change of venue to DuPage county was made in December of that year. The plaintiff thereafter in March, 1905, moved for a change of venue from all the judges of the sixteenth circuit, one of the judges of said sixteenth circuit being now one of the justices of this court; that motion was allowed and the cause was at the request of the said judges of the sixteenth circuit, tried by a jury before one of the judges of the seventeenth circuit in DuPage county, the trial lasting from May 1 to August 26, 1905. A verdict was returned in favor of the plaintiff for $100,000; motions for a new trial and in arrest of judgment were overruled and judgment was rendered on the verdict on September 25, 1905. The defendant appeals to this court.

A change of venue having been taken from one of the justices of this court, he deems it his duty to refrain from taking part in the consideration of this appeal. The record is a very long one, consisting of more than 11,000 pages, the printed abstract containing more than 3000 pages, and the case appears to have been very closely contested. Objections were made to almost every step taken by the plaintiff in the case, and exceptions were preserved to the rulings of the court. Many assignments of error have been argued in detail, and they present questions some of which are new,

serious and important, concerning the competency of the evidence admitted for the plaintiff and the right of the plaintiff to recover for some of the property that was destroyed. The case was continued from time to time in this court by agreement of the parties until it was argued and submitted for adjudication at the April term, 1908.

It is insisted that the court erred in granting a change of venue from Cook county to DuPage county, and that the very great preponderance of the showing made by the parties demonstrated that there was no reason for changing the venue from the county where the suit was begun. Affidavits were made by eleven persons in support of the petition for a change of venue, while seventy-five persons made counter affidavits. The petition was addressed to the sound legal discretion of the court. The number of affidavits on either side is not necessarily a controlling factor in passing on such an application. The defendant went to trial in the Circuit Court of DuPage county without objection. Where a change of venue is improperly granted the proper practice for the party complaining seems to be to move to remand the cause to the county from which it was sent, and if the motion is overruled, to take an exception. Johnson v. Von Kettler, 66 Ill. 63; Hitt v. Allen, 13 Ill. 592. This was not done. Moreover the appellant did not include any such reason in its written motion for a new trial, wherein the grounds of the motion were specified in detail. Yarber v. Chicago & Alton Ry. Co., 235 Ill. 589. If, however, the original exception to the order granting the change saved the question for review, yet as the affidavits were conflicting and the matter within the sound discretion of the court, we should not feel warranted in reversing because of the change of venue.

The action is based upon a statute of this state providing as follows:

"That whenever any building or other real or per-

298    APPELLATE COURTS OF ILLINOIS.

P., C., C. & St. L. Ry. Co. v. City of Chicago, 144 App. 293.

sonal property, except property in transit, shall be destroyed or injured in consequence of any mob or riot composed of twelve or more persons, the city, or if not in a city then the county in which such property was destroyed, shall be liable to an action by or in behalf of the party whose property was thus destroyed or injured for three-fourths of the damages sustained by reason thereof.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"No person or corporation shall be entitled to recover in any such action if it shall appear on the trial thereof that such destruction or injury of property was occasioned or in any way aided, sanctioned or permitted by the carelessness, neglect or wrongful act of such person or corporation; nor shall any person or corporation be entitled to recover any damages for any destruction or injury of property as aforesaid, unless such party shall have used all reasonable diligence to prevent such damage.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"No action shall be maintained under the provisions of this act, by any person or corporation whose property shall have been destroyed or injured as aforesaid, unless notice of claim for damages be presented to such city or county within thirty days after such loss or damage occurs and such action shall be brought within twelve months after such destruction or injury occurs,   \*   \*   \*"

It is urged the motion in arrest of judgment should have been sustained because the declaration is insufficient in that it does not state a cause of action by failing to state facts but only stating conclusions in several particulars. It is argued (1) "that ownership is not alleged as a conclusion, nor by way of uncertain or incomplete statement, by way of argument, by evasion, nor is there any allegation from which it can necessarily be inferred. All that is alleged is possession"; (2) "that the declaration should locate the mob as within the city of Chicago"; (3) the statute "requires that such party shall have used all reasonable diligence to prevent such damage," while the declara-

tion only avers that the injury was not occasioned through any neglect on the part of the plaintiff to use reasonable diligence to prevent such injury; (4) that "the declaration does not aver that a notice of plaintiff's claim for damages was presented to the city within thirty days after the destruction or damage to its property occurred."

The numerous alleged defects in the declaration which have been presented for our consideration are purely formal. The defects complained of could not have been reached by a general demurrer. They could only have been grounds for a special demurrer assigning the causes. A judgment after verdict can only be arrested for substantial faults. All defects which would not have been fatal on a general demurrer are cured by pleading to the issue, and are aided by verdict. When the pleading states the essential requisites of a cause of action, the court will presume that the particular fact or circumstance which appears to be defectively or imperfectly stated or omitted was proved at the trial. A defective or inaccurate statement of a cause of action is cured by a general verdict but where no cause of action is stated a verdict will not cure the defect. Gould on Pl., chap. X.

Counsel for appellant state in their original argument (p. 21): "The declaration states the name of the plaintiff. It states that 'said plaintiff was possessed as of its own property,' of the railway equipment, etc., described and claimed to have been injured or destroyed, and for which judgment is asked. It also avers 'that the property of the plaintiff was destroyed or injured.' These averments only amount to an assertion that the plaintiff *was the owner* of the property mentioned and that the legal title was in the plaintiff. Such an averment is only a mere statement of a conclusion of law and amounts to nothing as an averment." At common law the possessor of personal property is *prima facie* the owner of the property.

300    APPELLATE COURTS OF ILLINOIS.

P., C., C. & St. L. Ry. Co. v. City of Chicago, 144 App. 293.

The averments that "plaintiff was possessed as of its own property," and "the property of the plaintiff was destroyed or injured," amount to an allegation of ownership by the plaintiff, when the declaration is first questioned after verdict. Beigen v. Riggs, 34 Ill. 170. On a motion in arrest of judgment "every intendment will be indulged in favor of the declaration, and if it contains terms sufficiently general to comprehend by fair and reasonable intendment any matter necessary to be proved, and without proof of which the jury could not have given the verdict, the want of an express averment in the declaration has been cured by the verdict." Danley v. Hibbard, 222 Ill. 88; Fountain Head Drain Dist. v. Wright, 228 Ill. 208. We hold that the conclusion to be drawn from the averments of the declaration is that the plaintiff is the owner of the property destroyed or injured.

The declaration avers that "within the territorial limits of the city of Chicago, aforesaid, in consequence of a certain mob or mobs, riot or riots, each of which was then and there composed of twelve or more persons within the territorial limits of said city of Chicago, a large quantity," etc. This language locates the mob within the city of Chicago in the language of the statute and fully answers the second reason urged in arrest of judgment.

We do not think it necessary to comment on the third and fourth reasons urged in arrest of the judgment further than to state that under the rule announced in Danley v. Hibbard, *supra,* the allegations contained in the declaration concerning these matters are sufficiently general to comprehend by fair and reasonable intendment the matters necessary to be proved in the respects complained of, and the court did not err in overruling the motion.

The proof shows that in June, 1896, a general strike was declared by the American Railway Union, and that many thousands of railway employes abandoned their

work.   This general strike was a sympathetic strike in aid of the employes of the Pullman Company, who had been on a strike since some time in May of that year.   The city of Chicago appears to have become the center of the strike hostilities.   The employes of the railroads having abandoned their work and refusing to return, the railroads brought to Chicago "strike breakers" and endeavored to run their trains with these men, many of whom were inexperienced but were willing to take the places of the old employes.   When the railroads began to try to operate their trains with the strike breakers and new men, mobs began to gather along the lines of the railroads and interfered with the operation of the trains.   Counsel for appellant state in their argument that "The fact that so many men became idle at once, in connection with the animosities engendered and the doubt and uncertainties existing as to the future relations of the men with the companies, produced a condition somewhat alarming and was supposed to threaten the peace and welfare of the city.   The strike also succeeded in stirring up to some extent the rougher elements."   At the commencement of the strike there were 3000 policemen in Chicago and about 500 more were sworn in on the fifth and sixth of July.   The United States Marshal, who under ordinary circumstances has ten deputies, had about 1600 special deputies, all sworn in because of the strike difficulties, and he swore in some 2600 railway employes as special deputies of the various railroads in Chicago who acted under the direction of the railroad officials during the strike in endeavoring to protect the railroads against the disorderly persons.   About 250 of the special deputies were employes of plaintiff and acted under plaintiff's officials.   On July 6, the mayor of the city of Chicago sent to the governor of Illinois a request by telegraph for the state militia to aid in preserving the peace and suppressing violence.   The governor in compliance with the request sent several regiments of

302     APPELLATE COURTS OF ILLINOIS.

P., C., C. & St. L. Ry. Co. v. City of Chicago, 144 App. 293.

militia to Chicago. The president of the United States also ordered government troops sent to Chicago to assist in quelling the disturbances. The regular troops arrived in Chicago on the fourth of July. Between the first and seventh days of July, but principally on the sixth, a large amount of railroad equipment and several hundred cars, many of them stored with merchandise, were totally destroyed by fire in the yards of the plaintiff in Chicago. The equipment destroyed and many of the cars destroyed belonged to the plaintiff, but a great number of the cars destroyed were only used by plaintiff and belonged to other railroads. The merchandise destroyed belonged to third parties.

Appellant argues that the notice and demand for damages offered and admitted in evidence, which is a notice and demand combined, is not sufficient to sustain the action. This notice and demand is in writing, signed by the second vice-president of appellee, the officer who under appellee's by-laws has charge of the legal and contract department. It is in the language of the statute, and has a schedule attached describing the property in detail, and whether destroyed or injured, the place of loss, the date of the loss, and the amount of the damage to each item of property; it was served by the solicitor for appellee on the mayor of the city by handing him a true copy on July 28, 1894. Many extremely technical points are attempted to be urged concerning this notice. It was clearly sufficient, and we fail to find any merit in the points raised in the argument upon this contention.

Appellant insists that it was not shown by the evidence on the trial that appellee's property was destroyed in consequence of any mob or riot composed of twelve or more persons. The property destroyed was mostly in two of appellee's yards; one called the Brighton Park yards, located between Forty-third and Forty-seventh streets in Chicago; the other, the Fifty-ninth street freight yard, located between Fifty-fifth

and Sixty-third streets in Chicago. The appellee's railway is properly known as the Pan Handle, and is frequently so called by the witnesses.

A great number of witnesses testify to acts of violence and to facts showing that a reign of terror existed at both yards, that the crowd in the vicinity of the yards were overturning cars, setting fire to them, obstructing the police of the city, and threatening and terrorizing the employes of appellee that remained at work or were newly employed. The evidence shows that some twenty-three railroads running into Chicago were involved in this strike. The railroads acted together in resisting the strike through what is known as the General Managers Association, which had an office in the Rookery Building in Chicago.

John M. Egan was in charge of this office, and to him the officials of the railroads severally reported where disturbances and difficulties existed or were expected from the strikers or their sympathizers. Egan communicated the information to the police inspectors and to the chief of police. As early as June 29, Egan, acting for the appellee and other railroads, sought to have the mayor of the city secure the state militia to preserve the peace, and made arrangements to convey peace officers to where, from the reports received, difficulties might be expected. On the afternoon of July 6, Charles Watts, superintendent of the Pennsylvania lines west of Pittsburgh, which include the Pan Handle, acting for the appellee, called on the chief of police with reference to furnishing protection for appellee and told him of threats and requested that officers should be sent to its yards; and again on the same evening Watts asked the city officials over the telephone why men were not sent to the yard and was told the city did not have the men to send. Appellee's Fifty-ninth street yard is the yard most distant from the center of the city. The rioters from the evidence appear to have first fired cars in the Brighton Park

304    APPELLATE COURTS OF ILLINOIS.

P., C., C. & St. L. Ry. Co. v. City of Chicago, 144 App. 293.

yards, and then went south into the Fifty-ninth street yard where from 800 to 900 cars were stored. Henry C. Maher, a day watchman in the Fifty-ninth street yard, testified that about 12:30 on July 6 about fifty people came from Forty-third street and turned over a car at the north end of the Fifty-ninth street yard, and that at about four o'clock, six or eight persons came from the vicinity of the Northern Pacific tracks, and three or four of them went to the office and tore down the telephone, and some boys undertook to take out a handcar; that he chased them away and put the handcar off the track, and on going back to the office saw a car had been fired, and being unable to put it out went to the telephone, when he saw that another fire had been started, further north, and then he telephoned to the city offices that fires were being started; that at that time there was a big crowd of men, a couple of hundred, working south through the yard.

Stephen Lancto, a carpenter working on a roof, testified that he saw twenty to twenty-five men at Fifty-fifth street throwing at the little flag house and breaking the gates; that he saw these men go south towards Fifty-ninth street along the tracks, and could see a blaze once in a while where another fire would be started; that he saw this in several places. The next day he saw that the cars had been burned.

Homma Huicanga, a gardener, living three blocks south of Fifty-fifth street on the west side of plaintiff's tracks, testified that on the afternoon of the fire he saw many people, probably fifty, come and tip over some cars; one car was tipped on appellee's tracks at Fifty-fifth street. Afterwards he saw a fire near Fifty-fifth street, and then right along the line up to Sixty-third street as far as he could see the cars were on fire; that there were from fifty to two hundred people there, and some boys with a handcar were going up and down and going into the cars with a five gallon oil can, and in a few minutes fire would come out.

P., C., C. & St. L. Ry. Co. v. City of Chicago, 144 App. 293.

Oscar Therien, a foreman in a cigar factory, who lived at Fifty-sixth street and Western avenue at the time of the fire, testified that hundreds of cars were destroyed; that the yard was filled with cars before the fire; that he saw a crowd of a hundred or more telling an old man to come down from the tower at Fifty-fifth street, that they were going to fire the tower; that a man came with an oil can and set the tower on fire, that they broke the gates at both sides; that the crowd followed a fellow with a handcar; that "they went right into the Pan Handle yards, and then the whole thing was in blazes around here and there."

Mrs. Bertha Delude testified that on the afternoon of July 6th she saw three or four cars burning on the Pan Handle track between Fifty-first and Fifty-second streets; there was a big crowd around those cars, over fifty persons, who were throwing stones at a passenger train.

Emma Mansel testified to the crowd moving south from Brighton Park yard to the Fifty-ninth street yard; that there were two hundred to three hundred persons right on the tracks, and they went into the yards at Fifty-fifth street and started fires there.

Josephine Osburn testified to seeing about one hundred men come up the track, upset and burn a car; that she saw about eight of them go into the yards towards Fifty-ninth street; they were gone about half an hour and when they came back all the cars were on fire; that the men ran Schwartz, the gateman, away, and that a boy climbed into the tower, saturated it with kerosene and set it on fire; that Schwartz ran away at that time to keep from being killed; that a gang of about fifteen men told the people in the depot to get out, cursed them and called them scabs.

Frank Schwartz, the gate crossing or tower man at Fifty-fifth street, testified that he saw trouble at Fifty-second street; there was a big crowd there and they dumped a car at that street; this was about two o'clock

in the afternoon and there were thirty or forty of them. Some of the crowd came to where the witness was and climbed up on the tower and lighted a fire there; they broke down the gates; there were two hundred people there at that time.

Charles E. Danke, a police officer at the time of the fire, testified he, with other policemen, was sent over to the Fifty-ninth street yard about seven o'clock and there was a crowd of from three to four hundred people around the track and at least half of the cars standing there were on fire; "when we got there the crowd was running in and around the cars, some of them on top of the cars, carrying firebrands from car to car, I saw them break open car doors and carry fire from one car to another"; that there were from eight to twelve policemen there, but no arrest was made that he knew of.

. Paul Bessmer, then a police officer, testified that he, with eight or ten officers and a sergeant, went to the Fifty-ninth street yards; when they got there the tower house was burning; a good many hundred cars were there and they started to burn in all directions, one car here and another there; they tried to get the crowd away, there were several thousand people around there; some of them tried to overthrow the cars, and there was fire in different places; they stayed until the troops came.

A great many other witnesses testified in a similar strain to the origin and progress of the fire from the Brighton Park yards to and in the Fifty-ninth street yards. The evidence shows that at some places there were but a few persons engaged in the work of destruction, at others there would be a crowd of twenty or thirty, and from that number up to several hundred, all co-operating and encouraging each other in the destruction of property, breaking switches, and overturning cars on the tracks so as to obstruct the movement of cars or trains, and setting fire to cars and any-

thing that would burn. The evidence would appear
to be conclusive that the property was destroyed in
consequence of a mob or riot composed of more than
twelve persons. The evidence is also clear that the
appellee used all reasonable diligence to prevent such
damage with such few employes as remained at work,
in securing the assistance of United States marshals,
in making demands for police protection, and by re-
questing the city authorities to secure the services of
the state militia in advance of the strike assuming
serious proportions.

On July 6, while the strike was in progress and prop-
erty was being destroyed, John P. Hopkins, the mayor
of Chicago, sent a telegraph message to John P. Alt-
geld, the governor of the State of Illinois, notifying
him that there were within the city "numerous riotous
bodies of men acting together by force with attempt
to commit violence, to offer violence to persons and
property, and by force and violence to break and resist
the laws of the state; that the civil authorities of this
city by means of the large territories over which these
men are scattered, the comparatively small number of
police and other police officers at the disposal of said
authorities and the large number of said riotous bodies
of men, are unable to restore the peace and to prevent
violence to persons and property"; and requesting
that the governor order five regiments of the state
militia immediately to assist the civil authorities in
suppressing violence. This dispatch was offered by
appellee and admitted as original evidence over the
objection of the appellant. The dispatch was prepared
by the legal department of the appellant city and
signed by the mayor. It is insisted on the part of ap-
pellee that it was competent as part of the *res gestae.*
The description of the riotous conditions was not a
part of the *res gestae* for the reason that it was not a
spontaneous expression of the mayor but was a delib-
erate statement of the legal department of the city

308 APPELLATE COURTS OF ILLINOIS.

P., C., C. & St. L. Ry. Co. v. City of Chicago, 144 App. 293.

prepared for the purpose of securing troops. Declarations to be *res gestae* must be spontaneous and not statements which are deliberate and prepared for a purpose. The mayor simply signed a paper prepared for his signature, possibly knowing nothing about the facts except as they were reported to him. The mayor afterwards was a witness for appellant and testified to his knowledge of the facts quite differently from the language of the dispatch, and the dispatch might thereafter have been competent by way of impeachment, but it will scarcely be insisted that it was competent to impeach him before he had testified; he might not have been called as a witness if the dispatch had not been admitted in evidence. We hold the dispatch was improperly admitted in evidence, but the facts stated therein were so conclusively proved by competent evidence that its admission was harmless error.

After a careful consideration of the case the two members of the court taking part in this case are clearly of the opinion that under the pleadings and the evidence no other verdict than one in favor of the appellee could reasonably have been returned.

We are unable to agree upon the right of appellee to recover for the destruction of merchandise belonging to other parties and of cars belonging to other railways, and upon the competency of much of the secondary evidence composed of copied records of train reports, "Historical records" of cars, and the "Borner Record," which is a record of the movements of cars upon appellee's lines in Chicago, which were admitted in evidence over the objection of appellant. One of the justices is of the opinion that in view of the facts and questions of law upon which we agree, and the great value of the property destroyed, there being about 100 cars destroyed in the Brighton Park yards and nearly 700 in the Fifty-ninth street yards, many of which were loaded with merchandise, besides much other property, three-fourths of the value of which far exceeded the

amount of the verdict, that there is ample evidence to sustain the verdict and that the errors complained of concerning which we agree, if they were errors, are not of sufficient magnitude to require a reversal, while the other justice is of the opinion that the matters complained of and concerning which we disagree are errors and are of such importance that they require a reversal of the case. There being but two justices acting in the case, and they being unable to agree as to whether the case should be affirmed or reversed, it is affirmed by operation of law. Binder v. Langhorst, 139 Ill. App. 493.

*Affirmed.*

Mr. Justice WILLIS took no part in the consideration of this case.