## Evalyn Kingman, Appellee, v. Louis S. Kingman, Appellant.

### Gen. No. 5,189.

1. MASTERS IN CHANCERY—*when conclusions set aside.* In matters other than stating accounts the master's conclusions are only *prima facie* correct, and the court, acting on its own motion or upon exceptions filed, may modify or reject the report if erroneous, defective or against the weight of the evidence.

2. SEPARATE MAINTENANCE—*when wife not entitled to.* In order for a wife to be entitled to a decree of separate maintenance she must prove that she is living separate and apart from her husband without her fault. *Held*, under the evidence, that the complainant did not show that she had a due conception of her duties as a wife, that she had not performed her obligations as a wife, that her constant journeys about the country against her husband's will and her extravagances were all matters which tended to show that her course of conduct had been such as not to justify a decree in her favor.

Bill for separate maintenance. Appeal from the Circuit Court of Peoria county; the Hon. T. N. GREEN, Judge, presiding. Heard in this court at the April term, 1909. Reversed. Opinion filed October 19, 1909.

WINSLOW EVANS, for appellant.

COVEY & COVEY, for appellee.

MR. JUSTICE THOMPSON delivered the opinion of the court.

This is a bill in chancery filed in September, 1908, by Evalyn Kingman, appellee, against her husband, Louis S. Kingman, appellant, for separate maintenance. The bill alleges that the parties were married in June, 1906; that complainant always treated the defendant with kindness and forbearance; that a few weeks after the marriage the defendant commenced a course of unkind, cruel and inhuman treatment towards the complainant; that defendant refused to furnish a home for complainant separate and apart from the other members of the family of defendant, and compelled complainant to live with the mother of defendant, an aged lady, whose society was not agreeable to complain-

ant; that soon after the marriage, defendant stated to complainant that he had married her with the understanding she would go upon the stage, for which she had had special training, and that he preferred that she should be absent from Peoria that he might resume his manner of living as when a bachelor; that defendant purposely treated complainant in such a manner as to make her life miserable and to compel her to live separate and apart from him, and since January, 1908, defendant has without any cause positively refused to live with complainant; that defendant has an annual income of $20,000 and refuses to furnish complainant with sufficient money to properly support herself. The defendant answered the bill, denying all the material allegations and stated that before the departure of complainant he had twice offered to furnish her a home separate from his mother's home; that he paid her an allowance of $20 per week while she lived with him, and had paid her a like allowance up to the beginning of this suit; that complainant wrongfully deserted him and went east without his knowledge; that he did not refuse to take her back; that her living apart from him was of her own volition and her own fault, and that his income was not in excess of $3,000 per year. The cause was referred to a master in chancery to take and report the evidence with his conclusions.

The master, after overruling objections to his report, reported the evidence, with his conclusions, that the complainant was living separate and apart from the defendant without fault on her part and that $35 per week would be a reasonable sum for her maintenance. The objections were renewed in the Circuit Court as exceptions and overruled and a decree entered in accordance with the report. The defendant appeals to this court and assigns as error that the court erred in finding, first, that the appellee was living separate and apart from the appellant without her fault; second, that she is entitled to separate maintenance, and third, that the amount allowed is excessive.

It is contended in behalf of appellee that when the findings of the master have been approved by the trial court they will not be disturbed unless clearly and manifestly against the weight of the evidence, and that the findings of the master are as conclusive on the parties as the verdict of a jury in a civil cause. Such is not the rule. In matters other than stating accounts the master's conclusions are only *prima facie* correct, and the court acting on its own motion or upon exceptions filed may modify or reject the report if erroneous, defective or against the weight of the evidence. Ennesser v. Hudek, 169 Ill. 494; Brueggestradt v. Ludwig, 184 Ill. 24; Larson v. Glos, 235 Ill. 584; Keuper v. Mette, 239 Ill. 593. The report of the master, while *prima facie* correct, is simply advisory and does not have the same force as a verdict of a jury in suits at law. Fairbury Agricultural Board v. Holly, 169 Ill. 9. In matters other than the stating of accounts the master is a ministerial officer and not a judicial officer, but in a case where the master has seen the witnesses and observed their manner and demeanor the finding of facts made by him is entitled to due weight.

The evidence introduced on the part of the appellee consists principally of her own oral testimony and of certain letters that passed between the parties. It is shown that before the marriage she had no family relations or ties, but had been adopted and brought up by strangers who maintained her in luxury; for a year before her marriage a Dr. Emerson, whose first wife had brought up appellee, had given her an allowance of $60 per month for her board, maintenance and clothing, etc. The parties became acquainted with each other through appellee meeting a sister of appellant at a school in Massachusetts and visiting this sister in Peoria some years before the marriage, but the parties had seen little of each other before their marriage. It appears from the evidence that at the time of the marriage appellee was twenty-eight years of age, and that she married appellant without any

of his family knowing that a marriage engagement existed between them, although she had been acquainted with his family about ten years. It was arranged before the marriage that there should be no child born as a result of the marriage, and appellee insisted and appellant conceded it was agreed that she might go upon the stage, enter upon the life of an actress, take an engagement for a year and while on the stage be absent from appellant. Immediately after the marriage the appellant took appellee to live with him at his mother's home in Peoria. The residence of the mother was a large, commodious, brick house in a good residence district, and was occupied by the mother and a brother of appellant and appellant and appellee with three servants. They appear to have lived together in peace about two weeks. Appellee then complained because she was required to live in the home of her husband's mother, and desired to return to Boston, where the marriage had taken place, and then go to New York to complete arrangements to go on the stage. In the latter part of July she went east to try and make arrangements to go on the stage, but was unsuccessful in procuring any engagement. Appellant met appellee in New York in August and the parties returned to Peoria in September. They stayed in appellant's mother's home a short time, then, appellant going out of town for a week, she went to the National Hotel; after that he stayed at his mother's, but took his meals at the hotel, and she continued to stay at the hotel, although he wanted her to go back to his mother's home, in which he was living alone at the time. He owned another eight or ten-room dwelling house a few blocks from his mother's residence, and he offered to fit it up and live there with appellee; this she refused to do, although she says it was a nice house. He wanted to have one servant and she insisted she would not keep house with less than two servants and a horse and buggy. He said he had no use for a horse and buggy. In March, 1907, he proposed to rent a house on Randolph avenue in

Peoria; she looked the house over, made no objections to it or to its location, and he rented it for two years. She testified that she did not want to keep house and live in Peoria, and that "I told him I would rather live east, because he said I could, I wanted to go to live with Mrs. Thayer in Boston." Within a few days after he rented the house and before they moved in, she asked him for money to go to Chicago with which to buy clothes; at that time he was paying her an allowance of $20 per week for her personal expenses. He paid her $300 in advance on this allowance; she took this advancement and went to Chicago, as she stated, to buy clothes, but did not use the $300 advanced for that purpose, but ran a bill at Marshall Field's of over $800 on his credit and went on to Boston to a Mrs. Thayer's, with whom she had boarded before the marriage. Appellant had no knowledge of her intention to go east, and testifies that the first information he had about her going east was a letter from her a few days afterwards saying she had left him and the future was uncertain; however, the letter is not introduced in evidence and she denies writing any such letter. There was no further communication between the parties until the fall of 1907, when, in November, Mrs. Thayer came to see appellant and asked for some financial provision for appellee's support. Appellant refused to say what he would do, but continued to send her the $20 per week. In January, 1908, appellee wrote appellant she was coming to see him, and she did come. He met her at the depot in Peoria and took her to a hotel, as the house he had rented for their use was now occupied by his sister. She wanted $35 per week or said she would come back to live with him. He said she could come back, but he would not pay her the $35 per week; she also wanted him to furnish her 'an outfit for a play. They stayed together at the hotel that night. The next day she went to Milwaukee and then to Chicago, where appellant again met her, and they stayed at the Grand Pacific Hotel. The following day he bought her a ticket to Detroit and

gave her money to pay her fare to Boston, and continued to pay her the allowance of $20 per week, but stated he was not consenting to her remaining away. In March she again came to Peoria and demanded $35 per week, threatening if that sum was not paid she would make him lots of trouble and ruin his business. She again went east and soon thereafter began this suit.

Her account of appellant makes him out to be a very undesirable character, and according to her testimony he has failed to properly discharge his duty to her, and we do not see anything in his conduct to commend him. She tells many unsavory and foul details which she says her husband had told her of his former life, part of which had some connection with her refusal to live with him, but he denies making any of such statements. If her testimony is true, she now seeks to justify her absence from him because of suspicions that he is untrue to her. The bill does not contain any allegations on which to base such proof. Neither of these parties appears to have any proper conceptions of the obligations assumed in entering into the marriage relation and neither of them appears to have intended to be bound to any great extent by the obligations which the law and domestic relations impose upon husband and wife.

As complainant she alleges, and the burden was on her to show, that she was not living separate and apart from him without her fault. This allegation is not sustained by the evidence. He was reputed to be a man of wealth and she appears to have married him for the money she expected to get from him. By her own story she did not intend to keep house with the appellant, nor to live with him where his place of business was, but to go upon the stage and spend her time traveling about the country. At the time of the trial she refused to return to live with him. She is not living separate and apart from him without her own fault, and it is her duty to return to him and take up the duties which the law imposes on a wife. Courts

ought not to encourage a wife in such reckless extravagance and in constant journeys about the country against her husband's will. For these reasons the decree cannot be sustained. It is therefore unnecessary to consider the other errors assigned.

The decree is reversed.

*Reversed.*