**Franklin D. Kelly et al., Plaintiffs in Error, v. Edwin Lehmann et al., Defendants in Error.**

## Gen. No. 6,652.

1. INSURANCE, § 71*—*when vendor of property is estopped to claim interest in same.* A vendor who, in negotiating the sale, executed instruments and gave verbal assurances to an insurance company with which the purchaser was negotiating for a loan of the funds necessary to make the purchase and to a title and trust company whose title policy the insurance company required of the purchaser that such purchaser was to take the title in fee with no secret agreement or trust in favor of the vendor, as the two companies required should be done before they would enter into the transaction, is estopped, as against the insurance company and title and trust company, to claim any interest whatever in the premises.

2. CORPORATIONS, § 406*—*when grantor cannot attack conveyance to corporation.* It is contrary to public policy to permit one who conveyed premises owned by him to a corporation organized by him in payment of his subscription to its capital stock, which conveyance was accepted by it as such payment, to cancel or qualify such conveyance thereafter, nor is such conveyance affected by the fact that there was a secret and unlawful purpose in organizing the corporation, which does not appear in the purposes expressed in its application for a charter and the certificate of incorporation or charter, the purposes set forth in which were lawful, nor by the fact that after such conveyance the Secretary of State issued a certificate of forfeiture of the corporate charter for failure to file an annual report and pay a fee therefor, but such conveyance operated to extinguish any secret right to repurchase or equities of the grantor theretofore existing in such property.

3. CORPORATIONS, § 19*—*when unlawful purpose of incorporators will not render corporation unlawful.* Where the purposes of a corporation as set forth in its application for incorporation and certificate of incorporation or charter are lawful, it is not rendered unlawful by the fact that the person organizing it had a secret, unlawful purpose for which he intended to use it.

4. CORPORATIONS, § 624*—*what is effect of forfeiture for failure to file annual report.* A certificate of forfeiture of the charter of a corporation, issued by the Secretary of State for its failure

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

to file an annual report and pay the fee therefor, does not deprive the corporation of its corporate existence, but is merely prima facie evidence of nonuser.

5. CORPORATIONS, § 621*—*when nonuser of franchise exists.* Nonuser of a corporate franchise can be finally determined only by a court of competent jurisdiction.

6. CORPORATIONS, § 412*—*when grantee cannot avoid equity in conveyance because of secret agreement.* Where a stockholder who owns nearly the whole of the capital stock of a corporation deals with the corporation as his own, equity will not permit one to whom the corporation conveys property to which it holds the legal title to avoid any clear equity arising between him and such stockholder from any secret agreement between them merely because the legal title came from the corporation by the stockholder's procurement and not from the stockholder personally.

7. MORTGAGES, § 17*—*what determines nature of deed or mortgage.* In determining whether a transaction was a sale or merely a taking of title in trust by the grantee to secure the payment of a loan, the form of the instruments and the manner in which they are executed are not conclusive, but the transaction is controlled by the intention of the parties as disclosed by the surrounding circumstances.

8. MORTGAGES, § 14*—*what are essentials of deed as mortgage.* A mere agreement to reconvey does not render a deed a mortgage, but it is essential to such end that there be a debt and an intention to secure its payment.

9. CONTRACTS, § 19*—*when law will imply contract to repay money.* Where one, at the request of another, borrows money and pays a debt owing to a third person by such other, the law imposes an obligation to repay with lawful interest.

10. FRAUDS, STATUTE OF, § 59*—*when express trust resting in parol does not arise.* The Statute of Frauds is a complete defense to an express trust in lands claimed to arise out of an oral agreement.

11. FRAUDS, STATUTE OF, § 60*—*when writing is necessary to establish resulting trust.* A resulting trust cannot arise from any verbal agreement between the parties.

12. TRUSTS, § 251*—*what evidence is necessary to establish trust.* Oral proof to establish that the grantee of property holds in trust for the grantor and that the conveyance is but a mortgage and that the grantor has the right to redeem must be clear, satisfactory, convincing, definite, unequivocal.

13. REFERENCE, § 10*—*what is effect of master's findings.* The findings of fact by a master on a reference to take the proofs and

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

report them and his conclusions of law and fact thereon do not have the weight of a jury's verdict, and the approval of his report by a chancellor, who has not seen or heard the witnesses, does not have the weight given the overruling of a motion for a new trial by a judge who has seen and heard the witnesses.

14. MORTGAGES, § 685*—*what agreements will not bar redemption.* On a bill in equity to redeem certain premises, certain transactions of complainants prior to the transfer of the property tending to mislead defendant as to its rental value, *held* not to bar complainants of their equity of redemption in view of his failure to repudiate the lease involved in the transaction, and since it was not shown that he would not be able to procure such a rental as the lease called for.

15. APPEAL AND ERROR, § 1678*—*when error in refusing filing of amended bill is waived.* Error of the lower court in refusing to permit a second amended bill to be filed is waived when not argued in the opening brief of plaintiff in error.

16. PLEADING, § 231*—*when refusal of leave to file amended bill is not error.* Where complainant has filed an original bill and a first amended bill, each of which were sworn to, it was not error to refuse a motion, in support of which no showing is made, for leave to file a second amended bill, not sworn to, which was, in part, a fuller restatement of the bill on which the case was tried, and also stated new matters and stated some matters in a different way from that in which they had been previously stated and stated some matters not supported by the proofs on file.

17. APPEAL AND ERROR, § 855*—*what presumption arises when certificate of evidence is not filed.* Where, by reason of the failure to preserve a certificate of evidence, the Appellate Court has no means of knowing what showing, if any, complainant made in the lower court in support of its motion to file an amended bill, it will be presumed that such showing, if made, was insufficient.

18. APPEAL AND ERROR, § 1755*—*when decree is affirmed by divided court.* Where one of the judges of the Appellate Court takes no part and the other two stand one for affirmance and the other for reversal, the decree will be affirmed.

Error to the Circuit Court of Peoria county; the Hon. NORMAN L. JONES, Judge, presiding. Heard in this court at the October term, 1919. Affirmed. Opinion filed May 7, 1920.

CHARLES R. HOLDEN and BARNES, MAGOON & BLACK, for plaintiffs in error.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Quinn & Quinn and Mansfield & Cowan, for defendants in error.

Mr. Justice Dibell delivered the opinion of the court.

Franklin D. Kelly and Marguerite Dorrance filed in the Peoria circuit court a bill in equity against Edwin Lehmann and Minnie R. Lehmann, his wife, to redeem certain premises in the City of Peoria, at the westerly corner of Jefferson avenue and Main street, extending 54 feet on Jefferson avenue and 111 feet on Main street, formerly known as the "Old Library Building." Lehmann had the title in fee of record. Mrs. Lehmann had no interest except an inchoate right of dower, and her interest will not be further noticed. A demurrer was sustained to the bill of complaint and an amended bill was filed. Defendants answered, denying that complainants had a right to redeem and setting up the Statute of Frauds. A replication was filed. The master in chancery had previously acted as counsel for some of the parties, and the court referred the case to a special master to take and report the proofs with his conclusions of law and fact. Proofs were taken and an elaborate report was prepared by the master, with findings for defendants. Objections were filed thereto by complainants and they were overruled, and the report was filed. Exceptions to said report were filed by complainants. Thereafter, on application of complainants, a change of venue was granted from the judges of the circuit court and a judge from another circuit was called in, and he heard the case upon exceptions to the master's report and overruled said exceptions. After the master's report was filed complainants asked leave to file a second amended bill, which they presented. At the hearing of the cause that motion was denied. The bill was dismissed for want of

equity. Complainants have sued out a writ of error to review said decree.

Kelly and Dorrance agree in testifying that for certain valuable considerations moving between them long ago, Dorrance is the equitable owner of one-half of all interests which Kelly has in said premises. There was no proof to the contrary. If Kelly has a right to redeem, we do not see that it is material to the interests of Lehmann whether Dorrance has a right to share in that redemption. If Kelly is entitled to redeem, that right should be extended to Dorrance, under the evidence in this record. We shall treat their interests as identical. Kelly acquired the fee and placed successive incumbrances thereon. In 1909, to discharge prior incumbrances, he gave a trust deed thereon to John M. Elliott, trustee, securing certain notes which afterwards became the property of John F. Nye, and which were merged in a foreclosure decree in 1911. In 1909, Kelly organized a corporation, named First Trust & Safe Deposit Company, hereinafter called the Deposit Company. Kelly subscribed for nearly all the capital stock, and by his action and that of the proper officers of the Deposit Company, he conveyed these premises to the Deposit Company (subject to certain incumbrances) in payment for his subscription to the capital stock. This capital stock was in his name, but he and Dorrance agree that she was the equitable owner of one-half of the capital stock subscribed by Kelly. Kelly negotiated another loan with John W. McDowell and deposited a part of this capital stock as security, and he and Dorrance also gave McDowell a quitclaim deed of the premises. The Nye decree of foreclosure was entered September 25, 1911. The McDowell debt came due about that time, and there were two judgments of record against Kelly for small sums. Kelly made a written proposition to Thomas H. Webb to cause the Deposit Company to convey said premises to Webb by war-

ranty deed for $125,000; that, if Webb accepted, he should furnish Kelly sufficient money to take up the McDowell indebtedness and to release the shares of stock McDowell held as collateral, and that said note and stock should be turned over to Webb; that Webb should pay the Nye decree, interest and costs, and satisfy the two small judgments, and the rest of the purchase price should be paid to Kelly in cash; that Kelly should deliver all his stock in the Deposit Company to Webb, and Webb was to give Kelly a lease of the premises for 18 months from October 9, 1911, with an option reserved to Kelly therein to buy said premises within said 18 months for $137,000. Webb in writing accepted said proposition, but with the further written qualification that neither Kelly nor the Deposit Company should incur any indebtedness to Webb, except for the rental and taxes provided in said lease, and that Kelly was not to be under any obligation to exercise said option, and that in carrying out the contract, Webb would not obtain the title as mortgagee or as security for any indebtedness, but that Webb's title to the premises was intended to be and would be absolute and unconditional and without redemption by Kelly or any other person, and that Kelly's rights thereafter in the premises would only be those given him by the lease. This proposition was carried out. The Deposit Company held meetings of the stockholders and of the directors and authorized conveyance of said premises to Webb and such conveyance was made by the Deposit Company, first by a deed executed by its vice-president and acting secretary, and afterwards by another deed executed by its president and secretary. Webb paid the McDowell debt and the small judgments referred to and the Nye foreclosure decree, the total sum so expended being $117,830, and the balance of the $125,000 was paid by Webb by the direction of Kelly. McDowell and wife quitclaimed to Webb,

The building on said premises was three stories high. Before the conveyance to Webb, it had been seriously damaged by fire. The roof was temporarily repaired, but the top floor was practically unfit for use thereafter. The option which said lease from Webb to Kelly gave to Kelly to purchase the premises for $137,000 in cash was to run until April 9, 1913. On April 8, 1913, complainants assigned to Webb all leases they had made to any part of said premises prior to that date, and directed all tenants to attorn and pay to Webb all rents thereafter accruing. Kelly surrendered said lease on that date, and the complainants quitclaimed to Webb all their interest in said premises, and Webb executed to Kelly a new option to purchase the premises for $153,000 in cash until 3 o'clock p. m. of November 1, 1913. Webb leased to Kelly all the office rooms in the second story of said premises for a nominal rental of $1.00 per month to the last day of November, 1913.

In June, 1913, Dorrance in behalf of both complainants entered into negotiations with Lehmann. Prior to that time Kelly and Dorrance had been negotiating with various financial institutions to secure some financial arrangement concerning this property by which they could secure a deed from Webb. Each of these efforts had been a failure. Lehmann decided to assist them, and advanced them various sums of money for their personal needs, and the complainants agreed to assign him their option from Webb to purchase the premises. Dorrance had sought to borrow money of the Massachusetts Mutual Life Insurance Company of Springfield, Mass., but had failed. Lehmann, accompanied by Springer, the Chicago agent of the insurance company, went to Springfield, Mass., and obtained a promise of a loan of $150,000, on the property, on condition that Lehmann obtain the title and secure the loan by a first mortgage lien on the premises, which loan should be closed

about October 15, 1913, of which sum $100,000 should then be paid over to Lehmann and the balance should be paid him when he had expended not less than $70,000 in improvements on the premises. As Lehmann must at once pay Webb $153,000, and must spend $70,000 in improvements, a total of $223,000, before he could draw the last $50,000 from the insurance company, it became necessary for him to arrange to get at least $75,000 on his own credit, and this he was able to arrange with his brother, Arthur L., and perhaps other relatives, upon complainants representing to Lehmann and his brother that the title Lehmann would acquire would be absolute and unconditional, free of all trust agreements, secret or otherwise, and without the reservation of any rights or equities therein to the complainants or either of them. Lehmann then executed to the insurance company his notes for $150,000 with a mortgage upon the premises to secure the same. Before the insurance company would enter into this arrangement they required and received from Lehmann and Kelly and Dorrance a statement that Lehmann was to have an absolute title and was not to hold the property in any trust, secret or otherwise, for the complainants or anyone else. The insurance company also required, as a condition precedent, that Lehmann should secure a guaranty of the title from the Chicago Title & Trust Company. The latter, before delivering such a guaranty, sent an agent to Peoria, who got together Kelly, Dorrance, Lehmann and his brother, Arthur, and received personal assurances from them that Lehmann was to have the absolute title and that Kelly and Dorrance were to have no interest therein. Thereupon, these arrangements were all carried out. Webb was paid under the last option, and conveyed the premises to Lehmann. The Nye foreclosure decree was released. The title was made clear of record, in Lehmann, and the mortgage to the insurance

company was recorded. Complainants quitclaimed their interests to Lehmann and in the same instrument also assigned to Lehmann their interest in the option. This instrument was recorded, and thereby Lehmann became the owner in fee of the premises, so far as the records disclosed, free of all claims of Kelly and Dorrance, except under the lease to Kelly which would expire on the last day of November, 1913, but subject to said mortgage to the insurance company.

Before Dorrance had made application to different financial institutions for a loan upon the property, she had caused an architect to prepare plans for a reconstructed building of six stories and also for a new building twelve stories high. As we understand it, these plans did not include any details or specifications of the building to be constructed, and they therefore were necessarily comparatively unimportant and of slight value. After Lehmann had secured the title and after Kelly's lease had expired at the end of November, 1913, Lehmann discarded the architect engaged by Dorrance and discarded the plans, and made preparations to remove the old building. The proof is that the walls of the old building were insufficient to enable him to get authority from the city under its ordinances to even raise the old building to five stories. There was much controversy between Dorrance and Lehmann because of her insistence that he should employ the architect whom she had employed and make the building according to the plans she had procured and of the color which she had selected. Lehmann did not yield, but let a contract for the destruction of the old building and that work was begun about the time the original bill was filed, which was April 30, 1914. Before that bill was filed, and also afterwards and before the reference to the master, various written propositions for a settlement were submitted by each side to the other and were rejected. Complainants' contention is that, not-

withstanding the instruments which they have exe-
cuted and the verbal assurances they have given to
the insurance company and to the title and trust com-
pany that Lehmann was to take the title in fee with
no secret agreements or trust in favor of complain-
ants, nevertheless the different persons to whom they
have from time to time conveyed these premises have
always held them in trust for Kelly and Dorrance,
and it has always been the secret understanding with
Lehmann that they may pay off the insurance com-
pany mortgage and have the premises conveyed to
them. Undoubtedly, as to the insurance company and
the guaranty policy of the title and trust company,
complainants are estopped to claim any interest what-
ever in the premises. It is no doubt possible for
Kelly and Dorrance to have a right to redeem en-
forceable as against Lehmann.

Kelly conveyed the premises to the Deposit Com-
pany in payment of his subscription to the capital
stock of that company. The Deposit Company ac-
cepted the conveyance as such payment. It would
be contrary to public policy to permit Kelly after-
wards to cancel or qualify that conveyance. The De-
posit Company took the entire title, subject to the
incumbrances specified in the deed; and its convey-
ance to Webb was without any secret liens or trust
agreements made or authorized by the Deposit Com-
pany. But complainants urge that the purpose for
which the corporation was organized was not author-
ized by law, and therefore the conveyance to the De-
posit Company should be disregarded. The purpose
expressed in its application for incorporation, and in
its certificate of incorporation or charter, was
within the statute. If Kelly in organizing it had a
secret, unlawful purpose, for which he intended to
use the company, that does not make the corporation
unlawful; and his secret purpose cannot invalidate
his subscription to the capital stock or his convey-

ance to the corporation, intended to pay his subscription and accepted by the corporation as such payment. Under date of March 16, 1910, the Secretary of State issued a certificate of forfeiture of the charter of said corporation for failure to file an annual report and to pay a fee of $1.00 therefor. This certificate did not deprive the company of its corporate existence. It is merely prima facie evidence of nonuser, and nonuser can be finally determined only by a court of competent jurisdiction. *People v. Rose,* 207 Ill. 352; *Gilmer Creamery Ass'n v. Quentin,* 142 Ill. App. 448; *Woodlawn Social Ass'n v. Anderson,* 187 Ill. App. 507. But if said certificate worked a forfeiture of its charter rights in general, still the Deposit Company had 2 years in which to sell its real estate, and its first deed to Webb was made in 1911, and was therefore valid. Moreover, this is a collateral proceeding, and the Deposit Company is not a party here. We therefore hold that the conveyance to the Deposit Company extinguished any secret equities or agreements prior to that time which permitted Kelly to redeem or repurchase the premises. That, however, did not prevent Kelly from making a secret agreement with Webb when he arranged to have the Deposit Company convey said premises to Webb. Though the legal title was in the Deposit Company, yet Kelly owned all its capital stock, and if he dealt with it as his own, equity would look at the substance and not the form, and would not permit Webb to avoid any clear equity which arose between Kelly and Webb from any secret agreement they may have made, merely because the legal title came from the Deposit Company by Kelly's procurement and not from Kelly personally.

The question whether Webb held the title as a purchaser or in trust for Kelly and Dorrance is only of importance in case the court should believe that it was held by Webb in trust and that that fact was

communicated by Kelly or Dorrance to Lehmann, before Lehmann took the title. The members of the court who join in this decision are divided in opinion on this subject. One of them is of opinion that Webb was merely a lender of money who held this title as security for its repayment; while the other is of opinion that Webb became the absolute owner in fee, subject to the written option to purchase which he gave Kelly.

Complainants claim that the transaction between themselves and Lehmann was either a loan of money or was a taking of the title by Lehmann in trust for Kelly and Dorrance. All the papers that were executed were to the contrary. That, however, is not conclusive against Kelly and Dorrance, as shown by numerous authorities, and among them are the following: *Tillson v. Moulton,* 23 Ill. 648; *Shaver v. Woodward,* 28 Ill. 277; *Preschbaker v. Feaman's Heirs,* 32 Ill. 475; and *Darst v. Murphy,* 119 Ill. 343. In *Preschbaker v. Feaman's Heirs,* the court said:

"To determine whether such a transaction is a sale, or a mortgage to secure the payment of the money advanced, the intention of the parties at the time must control. To ascertain that intention the transaction must be viewed in the light of all the surrounding circumstances. In equity, the form of the transaction is not regarded, but the substance must control. It is not the rule in equity that to constitute a transaction a mortgage, it should be so expressed in the instrument conveying the land, but it may appear by a separate agreement; nor is it necessary the deed and the defeasance, in terms, refer to each other. Their connection may be established by parol evidence, and the defeasance need not be even in writing. The conveyance may be absolute on its face, and yet be shown by parol that it was intended as a security for the payment of money, when it will be treated as a mortgage. *Miller v. Thomas,* 14 Ill. 428. In such a case all of the attendant circumstances will be con-

sidered, in ascertaining the true character of the transaction. It is from them the intention of the parties can be ascertained.''

We understand that to be a correct statement of the rule now prevailing in this State. The original bill and the amended bill each charged that the deed to Lehmann was in fact as security for what Lehmann borrowed and advanced on the property at the request of complainants. These allegations were necessary, because a mere agreement to reconvey (if one had been made) did not render the deed a mortgage, but in order to make it a mortgage it was essential that there be a debt, and an intention to secure its payment. *Caraway v. Sly*, 222 Ill. 203, and *Friend v. Beach*, 276 Ill. 397, and cases cited in those opinions. This is often, though not always, evidenced by notes of the debtor, which the grantee in the deed retains. Neither Kelly nor Dorrance ever gave Lehmann a note or notes for the repayment of said $150,000 or any part thereof, or of any other sum connected with this transaction. But Lehmann borrowed the money at their request, and partly to pay the debt of Kelly to Nye, which was over $100,000, and Lehmann from the avails of the mortgage paid that debt, through Webb. In such case the law imposes an obligation to repay with lawful interest. *Davis v. Hopkins*, 15 Ill. 519. Kelly therefore, by requesting Lehmann to pay the Nye decree against Kelly, or to furnish the money to Webb with which to pay it, became legally bound to repay Lehmann.

If there is here proof merely of an express trust, the Statute of Frauds set up in the answer is a complete defense. *Delfosse v. Delfosse*, 287 Ill. 251, 265; *Miller v. Miller*, 266 Ill. 522; *Stubbings v. Stubbings*, 248 Ill. 406; *Evans v. Moore*, 247 Ill. 60; *Ryder v. Ryder*, 244 Ill. 297; *Lancaster v. Springer*, 239 Ill. 472. A resulting trust cannot arise from any verbal agree-

ment between the parties. *Plummer v. Flesher,* 246 Ill. 313; *Wells v. Messenger,* 249 Ill. 72.

There is much oral testimony introduced by complainants to show that Lehmann holds this property in trust for them and is in fact but a mortgage. There is much oral testimony introduced by Lehmann to prove that the oral testimony of complainants on that subject is untrue, and that there was not such an oral agreement. Oral proof to establish that relation and a right to redeem must be clear, satisfactory, convincing, definite, unequivocal, and, as one case says, by the most clear and convincing evidence. *Gannon v. Moles,* 209 Ill. 180; *Rankin v. Rankin,* 216 Ill. 132; *Miller v. Mandel,* 259 Ill. 314; *Friend v. Beach,* 276 Ill. 397; *Rasch v. Rasch,* 278 Ill. 261; *Novak v. Kruse,* 288 Ill. 363. The testimony upon the points material to the case as stated in the pleadings is very contradictory. The master saw and heard all the witnesses. He found that the case stated by complainants was not established. The court approved that conclusion. It is argued by defendants that the findings of fact by a master on such a reference to take the proofs and report them and his conclusions of law and fact thereon, confirmed by the chancellor, will not be disturbed by a court of review as to the facts, unless they are manifestly against the weight of the evidence. There are decisions to that effect. *Siegel v. A. H. Andrews & Co.,* 181 Ill. 350; *Ruddy v. McDonald,* 244 Ill. 494, and cases cited in those opinions. But the rule now approved is that such a report of the master does not have the weight of a verdict of a jury, and that the approval by the chancellor, who has not seen or heard the witnesses, does not have the weight given to the overruling of a motion for a new trial by a judge who has seen and heard the witnesses; and that the master's report, so approved, is advisory only. *Larson v. Glos,* 235 Ill. 583; *Keuper v. Mette's Unknown Heirs,* 239 Ill. 586; *Kelly v. Fahrney,* 242 Ill. 240;

*Corbly v. Corbly,* 280 Ill. 278; *Oliver v. Ross,* 289 Ill. 624; *Nofftz v. Nofftz,* 290 Ill. 36. We followed this rule in *Kingman v. Kingman,* 150 Ill. App. 456.

The oral testimony bearing upon complainants' contention that there was an express oral contract between complainants and Lehmann that he should take the title as security only, is not of that clear and convincing character required to establish the case for complainants. One of the members of this court participating in this decision is of opinion that, that conclusion is decisive that the decree of the court below should be affirmed. The other is of the opinion that the conduct of the parties, not disputed in the evidence, or upon which the proof greatly preponderates in favor of complainants, requires the conclusion that Lehmann was in fact a lender of money and credit upon the security of this property, and that complainants are entitled to redeem. As we are not agreed as to this proof of the conduct of the parties, a recital of that proof is omitted from this opinion.

Two other matters ought to be noticed. Before negotiations with Lehmann were begun, Dorrance entered into negotiations with the United Cigar Stores at Chicago to lease the first floor and the basement of the building, and an agreement which included an agreement for a lease was prepared, obviously by the United Cigar Stores Company, and executed by that corporation and by Dorrance, but not executed by Kelly except as a witness, and not intended to become binding as yet. The agreement for a lease provided that the lessee should pay $25,000 per year for the first 5 years for the first story and basement, and $30,000 the next 5 years, making a very high rental from that story. In another part of the agreement it was said that it should be subject to the conditions provided in Exhibit "A" the proposed form of the lease, attached thereto. Dorrance showed this agreement without Exhibit "A" to Lehmann, to show what

a wonderfully paying property this would be when put in proper shape, and it appears to have been that agreement which first attracted Lehmann's attention to the property, and which convinced him that it would be a paying investment. Before he agreed to take the property, he, with Dorrance, went to an officer of the proposed lessee and ascertained from him that the right to enter into such a lease could be extended for one year. After Lehmann had obtained the property and was entirely involved in the enterprise he went to have a proper lease executed with said lessee, and was then asked if he had read exhibit "A," and it was then produced to him, not having been attached to the instrument which Dorrance showed to him. It then turned out that by Exhibit "A," the United Cigar Stores was to have the corner store rent free for 10 years; that they were to collect what rent they reasonably could from the rest of the first floor and basement, but with an express provision that they should not be guarantors, and Kelly and Dorrance were to have, as the sole rent of the first floor and basement, whatever sum the United Cigar Stores obtained from the part it did not occupy, whether it was much or little. In other words, the lease was of no value as indicating what the real rental value of the premises was or would be, and by showing Lehmann only the lease without Exhibit "A" the latter was entirely misled. A serious question in the case is whether that use by Dorrance with Lehmann of that lease was such a fraud upon Lehmann that he ought to be released from permitting them to redeem the premises. Of course, it is not a sufficient answer to this to say that Lehmann might have called for Exhibit "A" and examined it. He did not do so, and he did not suppose that Exhibit "A" changed the rent. He did not, however, seek to repudiate the transaction or obtain any relief when he discovered Exhibit "A"; and it is not proved that he will not be

able to get as large an amount of rent from the first story and basement of the new building as was provided by the part of the lease first shown him, and we conclude that complainants are not barred of their equity of redemption by reason of that transaction.

Some time after the master's report had been filed in the circuit court, and exceptions had been filed thereto by the complainants, they made a motion for leave to file a second amended bill, and made a copy thereof a part of the motion. The court refused leave to file it, and that ruling is assigned for error. This point seems not to have been argued in the opening brief. If not it is waived. The original bill and the first amended bill were each sworn to. The second amended bill was not sworn to. It was in part a restatement, much more fully, of what was stated in the bill on which the case was tried. But it also stated new matters, and stated some matters differently from the way they had been previously stated, and stated some matters not supported by the proofs on file. In *Taylor v. Taylor*, 259 Ill. 524, on p. 534, it is held that the court may refuse to permit a sworn bill to be amended so as to contradict what had previously been sworn to, unless the complainants showed the original statement was a mistake; and if the new or different facts are such that they must have been known to complainants when the original bill was filed, that may be considered. To the like effect is *Walker v. Struthers*, 273 Ill. 387, where it is also said a reviewing court should not reverse for refusal to allow an amendment unless manifest abuse of discretion by the court is shown. See also *Rasch v. Rasch*, 278 Ill. 261. We have no means of knowing whether complainants made any showing in support of their motion for leave to file the second amended bill, for no certificate of evidence on that subject is preserved. If no showing was made, the motion was properly denied. If a showing was made, we must presume, in support of

the ruling of the court below, that such showing was insufficient. The denial of this motion for leave to file the second amended bill is approved.

Mr. Presiding Justice Niehaus has deemed it his duty not to take part in this case in this court, because of the change of venue from him in the court below. The other members of this court are agreed on certain matters which we have stated in this opinion, but disagree as to the final result. We have given much consideration to the case. Two opinions have been prepared, one affirming and the other reversing and remanding with directions to enter a decree establishing complainants' right to redeem, with reference to a master to take proof and state an account. Neither opinion has been adopted. It follows that the decree must be affirmed by operation of law, under the authorities cited by this court in *Binder v. Langhorst,* 139 Ill. App. 493. We have thought it proper to state the case and the conclusions upon which we agree, as this court did in *Pittsburgh, C., C. & St. L. Ry. Co. v. City of Chicago,* 144 Ill. App. 293.

*Decree affirmed.*

MR. PRESIDING JUSTICE NIEHAUS took no part.