JACOB DARST

*v.*

MARY MURPHY *et al.*

*Filed at Ottawa January 25, 1887.*

1. MORTGAGE—*of a deed absolute in form—whether a mortgage—of evidence on that question.* The true character of a transaction may be shown by parol, and if, upon a consideration of the facts, it clearly appears that the deed, though absolute in form, was taken as security for the payment of money, it will, in equity, be held a mortgage.

2. Ordinarily, the intent of the parties is to be drawn from a consideration of the deed itself. Therefore, to change the character of the instrument by parol, by attaching to it a condition of defeasance, the evidence should be clear and satisfactory.

3. The *gist* of the inquiry, in cases of this class, is, what was the purpose for which the deed was executed; and every fact or circumstance tending to illustrate the purpose and intent of the parties is receivable as evidence.

4. The fact of an existing indebtedness, in respect to which the deed is executed, the retention of the evidence of such indebtedness by the grantee in the deed, that the deed was procured by fraud or oppression, that there was a loan of money, the subsequent conduct of the parties in respect to the land, as, that the grantor had retained possession, and the like, and, indeed, almost every conceivable state of facts legitimately illustrative of the transaction, has been held competent evidence on the question whether a deed absolute in form was intended as a mortgage, or security for the payment of money by the grantor to the grantee.

5. The declarations and statements of the parties contemporaneous with the execution of the deed, are admissible, not for the purpose of altering or varying the terms of the written instrument, but as tending to illustrate whether a condition of defeasance should be added thereto in equity; but such declarations are not necessarily of controlling force and effect, as they may be but a device to cover usury, or to conceal a hard and unconscionable bargain, and the like.

6. In this case, the inadequacy of the consideration, and the facts and circumstances under which a deed absolute in form was made, and the subsequent conduct of the parties in relation thereto, are stated, from which the court holds, the conveyance was merely a security for the payment of a sum of money advanced by the grantee to prevent the foreclosure of a deed of trust previously given by the grantor.

7. LACHES—*in what manner availed of.* If the *laches* of a complainant is relied on as a defence to equitable relief by the defendant, he should set it up in his answer.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. DAVID McCULLOCH, Judge, presiding.

Messrs. FOSTER & KELLOGG, for the plaintiff in error.

Messrs. HOPKINS & HAMMOND, for the defendants in error.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

The principal question presented by this record is, whether the deed of September 3, 1869, from Murphy to Darst, was intended as security for the money advanced by Darst to take up the note of Murphy to Mrs. Stewartson, or was intended to be an absolute conveyance. The instrument purports to convey an absolute title to the grantee, and must be regarded as fixing the rights of the parties, unless some equity is shown that will defeat that effect, and from which the court may grant the relief sought by the bill.

The law is well settled, that the true character of the transaction may be shown by parol, and if, upon consideration of the facts, it clearly appears that the deed, though absolute in its form, was taken as security for the payment of money, it will, in equity, be held a mortgage. Ordinarily, the intent

of the parties is to be drawn from a consideration of the deed itself; therefore, to change the character of the instrument by parol, by attaching to it a condition of defeasance, the evidence should be clear and satisfactory.

The *gist* of the inquiry in cases of this class is, what was the purpose for which the deed was executed; and it will be found, by reference to the cases, that every fact or circumstance tending to illustrate the purpose and intent of the parties is receivable as evidence. The fact of an existing indebtedness in respect to which the deed was executed; the retention of the evidence of such indebtedness by the grantee in the deed; that the deed was procured by fraud or oppression or undue advantage; that there was a loan of money; the subsequent conduct of the parties in respect to the land, as, that the grantor had retained possession, and the like,— and, indeed, almost every conceivable state of facts legitimately illustrative of the transaction,—has been held competent evidence. In some of the cases, as in *Brown* v. *Gaffney,* 28 Ill. 149, evidence of oppression and undue advantage, in connection with the peculiar facts of that case, is made prominent and controlling, and in that and other cases, as in *Miller* v. *Thomas,* 14 Ill. 428, the inadequacy of the price paid is made, under the circumstances there proven, a prominent element in the solution of the question involved. 'The declarations and statements of the parties contemporaneous with the execution of the deed are admissible, not for the purpose of altering or varying the written instrument, but as tending to illustrate whether a condition of defeasance should be added thereto in equity. Such declarations, while admissible, may or may not be controlling. It may be, that the declarations are but a device to cover usury, or to conceal hard and unconscionable bargains, driven by a relentless or sharp and designing creditor, or the debtor may be misled into the execution of the deed, or, from the peculiar circumstances, shown incapable of understanding his relations to his creditor there-

under. In all such and kindred cases, equity will, if necessary to the ends of justice, look beyond the statements of the parties and written instrument, into the facts and attending circumstances, and give to the transaction its true character. An application of these principles to this case will relieve it of any considerable difficulty.

Murphy was old and illiterate, unfamiliar with the methods of business,—scarcely able to read or write,—and, as the evidence tends strongly to show, much below the average, mentally, and incapable of comprehending the difference between a deed of trust and an absolute conveyance. The evidence also shows, and we think the facts of the case demonstrate, that he confided in those with whom he dealt, to take care of his interest as well as their own. Mr. Darst, on the contrary, was a sharp and successful business man, possessed of a high order of business ability, and who had amassed a fortune in real estate transactions. In 1859, Murphy, who was then living in Peoria, received money from Ireland, and with it, purchased the one hundred and sixty acre farm in controversy, and some years afterwards moved upon it. He testifies that he had implicit confidence in Darst, and the course of dealing tends strongly to corroborate him. It appears, that on the 11th day of June, A. D. 1867, Murphy was indebted to Gardner T. Barker, in the sum of $120, and applied to Darst to borrow money with which to pay it. Darst declined to make the loan, but told Murphy he would take him where he could get it. On the way, he advised Murphy to borrow $300 and pay his debts. Murphy at that time owed Darst $50. They applied to Mr. Julius Starr, and he loaned Murphy $300, took his note therefor to Mrs. Stewartson, with a trust deed on this same land to secure it. There is some conflict as to where all this money went to, but it is clearly shown that $30 of the $300 was deducted out by Starr and credited on the back of the note as one year's interest, at ten per cent. The second year's interest ($30) fell due Janu-

ary 11, 1869.  On the 3d day of September, 1869, the interest and principal being due and unpaid, Murphy came to Peoria and endeavored to arrange the matter with Mr. Starr, but was unable to do so.  Starr had either advertised a sale of the land under the trust deed, or was about to do so.  He testifies: "The old man (Murphy) was there, (Starr's office,) crying, and made a terrible ado because I was going to sell him out, and I got out of patience with him."  Darst and Murphy met at Starr's office, and Murphy applied to Darst for the loan of money to take up the Stewartson note, which all agreed in saying amounted then to about $330.  Murphy testifies that Darst agreed to loan him the money, and did so, and that the paper he signed was drawn by Starr, and he signed it, at Darst and Starr's request, without its being read to him, and he supposed it was in some way a receipt showing he had received the money of Darst.  It is, however, shown by both Darst and Starr that he is mistaken in reference to the deed being read over to him.  Mr. Darst's version, taken from the abstract prepared by his counsel, is as follows: "I bought the land from complainant.  It is described in the deed, (of September 3, 1869,) or his interest in it.  He came into Mr. Starr's office.  I was sitting there, and he wanted to borrow some money.  I told him I would not loan him any money,—that if he had any real estate to sell, I would buy it, if he sold it right; and then he said he would sell what interest he had in this same property that he put this deed of trust on.  He said he did not want me to let his wife or family know that he had sold it.  He said he wanted to keep it from them.  He would rather I would have it than his family, because they used him so mean,—that he did not expect to live long, and wanted me to let him stay there as long as he lived.  This was about all that was said at that time.  The deed was made out then, and I paid Starr $300, and then we went down to the bank.  I think we went down there for him to get some of those tickets I had, and get some more money, but

I am not certain. I am satisfied he got some more money, because he always wanted some more money. The instrument that he signed at that time was fully explained to Murphy. He knew he was making me a deed of his land."

It is noticeable, if Mr. Darst is correct, that Murphy at once, without fixing upon any price for his land, upon Darst's proposal to buy if he "would sell right," closed with the offer, only asking that he be permitted to live on the land his lifetime. It is not stated that Darst even verbally consented to this request, while it is clear no reservation of his right of occupancy is mentioned in the deed, nor was any memoranda in writing made respecting it. We have said Murphy closed with the offer of Darst to buy. That offer was to buy if Murphy "would sell right,"—what was right was not discussed. Mr. Darst made no other offer. Murphy fixed no price on his land. Mr. Darst further testifies: "After we made the bargain, we went into Mr. Starr's, and he (Murphy) had him make this deed."

We have given, in full, Mr. Darst's account of that "bargain," which culminated in the execution of this deed. He testifies that he has given "about all that was said at that time." There is some conflict in the evidence as to who suggested that the consideration in the deed be expressed at $1000, but that is not material. It is not pretended that $1000 was ever paid. Darst paid Starr $300, and no more, but he testified he thinks he paid Murphy some money,— enough to make the whole amount paid, $400. He is, however, not definite in his recollection, and has nothing by which to refresh his memory. Murphy positively denies having received a dollar. The evidence shows the land worth, at the time of this transaction, from $5000 to $7000, from which should be deducted the inchoate right of dower in Murphy's wife, in considering its value.

It appears, and is not contradicted or sought to be explained, that when Darst paid Starr the $300, the note was indorsed

in blank, and delivered, with the trust deed, to Darst, who retained them, and, under subpœna, produced them at the hearing. It further appears that the note is credited with two years' interest. The first was retained out of the money loaned. The second indorsement of interest is shown to be in Starr's handwriting, and is as follows: "Received interest by Jacob Darst, until June 11, 1869, $30.—Mary J. Stewartson, by Julius Starr, Atty." It is not pretended, nor can it be from this record, that anything was paid prior to September 3, 1869. But it is said by Mr. Darst, again quoting from the abstract: "I did not own the note when the interest was paid, is my recollection." It is apparent that his recollection is at fault. If Darst purchased the land of Murphy, why take an assignment of the Stewartson note? Being indorsed in blank, and remaining uncancelled, he, or any subsequent holder, could fill up the indorsement, and, in equity, thus transfer the security, the trust deed remaining uncancelled and of record. Again, if the transfer of the land was absolute, why the particularity of the indorsement of the interest? If, as Murphy testifies, Darst agreed to take up the note as a loan to him, it is at once apparent why the interest is credited as having been paid by Darst, and why the date became important. The note would then show that interest had not been paid to September 3, but only until June 11, and that Murphy not only owed the principal, but the interest indorsed as paid by Darst, as well. But if it was an absolute sale of the land, the notes belonged to Murphy, were paid, and should have been cancelled and delivered up to Murphy. Mr. Darst could not be the owner of the land, and the consideration paid for it, at the same time. It could hardly be that the assignment of the note, and its being kept in condition to be enforced against Murphy, was accidental, but it is evident, we think, that it was purposely and intentionally done, and evidence of the exact amount paid by Darst carefully preserved

by him for a purpose. That purpose could only have been to preserve the evidence of the indebtedness of Murphy.

But this is not all. Darst testifies that Murphy said he would rather Darst would have the land than his family,—that he did not expect to live long, and wanted Darst to let him stay there as long as he lived. As before said, no written agreement was made or apparently thought of. No terms were mentioned between them, no rent reserved, no contract as to taxes, repairs or improvements even suggested. Murphy continued in possession without interruption, received all the proceeds therefrom, since the date of the deed to Darst, without interference by Darst in any way. He had paid all taxes, and so kept the place in repair, that, as he testifies, and is not contradicted, it could have been sold for $8000 shortly before the hearing. He was under no contract obligation to pay taxes or keep up repairs, if Mr. Darst's understanding of the transaction is correct. During all this time Darst made no other assertion of title than to place his deed of record. The declarations of Murphy, if Darst remembers them correctly, are not inconsistent with the theory that the money was advanced as a loan, except, perhaps, the declaration that he would sell his interest, and can readily be reconciled consistently with that theory, when the circumstances are all considered.

Some reliance is placed on the fact that Murphy permitted, substantially, ten years to elapse before asserting his right to redeem, and that he then, as it is claimed, endeavored to make a repurchase of the land from Darst. The obvious answer is, first, that Murphy swears that he did not know of the existence of the deed until after he had attempted to settle with Darst, and had actually paid him $300 on his claim. The weight of the evidence perhaps shows, that in the transactions relating to what Murphy calls a settlement with Darst, Darst used the words, that he would re-sell, and that Murphy could purchase, and Mr. Casey undoubtedly so understood it.

It is, however, evident, if it be conceded that Mr. Darst is correct in that regard, that the arrangement was not consummated, and if the deed was in equity a mortgage, only, there was nothing in these subsequent negotiations to change its character, even if Murphy understood the effect of the language employed. He testifies that he first learned that Darst had an absolute deed to his farm, only a short time before filing the bill in this case, from Mr. Cutler, whom he had sent to effect a settlement with Mr. Darst. Mr. Cutler testifies that when he went to Mr. Darst, at Murphy's request, Murphy had not informed him that any land was involved; that he asked Mr. Darst to see Murphy's note, and permission to cast up the interest on it. Darst replied, he had a deed for Murphy's farm, but said nothing about a note, one way or the other. Upon being asked what he would take for his claim against Murphy, he replied that his claim amounted to $1500, but he would take $1200. Mr. Cutler further testifies, that he told Murphy that Darst said he had a deed, and "the information affected him visibly—so much so that he wept about it." It is true, that this conversation is explained by Mr. Darst as referring to the so-called attempted repurchase of the property, and, very probably, correctly so. It is abundantly shown, also, that Murphy was improvident, and, as before stated, the evidence tends strongly to show, by reason of mental incapacity, aggravated by his habits, he was incompetent to understand business of this character. Many neighbors and business men of Peoria, who have known him for years, dealt with him and knew of his affairs, testify to his want of capacity to transact business, and his uniform habit to leave the business to be done by the party with whom he was trading, if he was a person in whom he had confidence.

We are of the opinion, that, in view of this evidence, the fact of the lapse of time without the assertion of his right to pay this debt, is of slight weight, when considered as an admission by Murphy of the absolute character of the con-

veyance. We are of opinion that the deed was intended as a security, only, for the money advanced by Darst, and the circuit court was fully justified in rendering its decree permitting redemption therefrom. There is, as we understand, no fault found with the amount found by the master, and decreed by the court to be paid, if the decree is in other respects warranted.

We do not understand that *laches* in the complainant in asserting his equities, is relied upon as a defence. It is not set up in the answer, as it should have been if relied upon as a defence, and is only incidentally, as it seems to us, referred to in the brief of plaintiff in error, and we refrain from further discussion of that question.

We are unable to perceive any error in this record warranting a reversal, and the decree will accordingly be affirmed.

*Decree affirmed.*