(No. 12938.—Decree affirmed.)

EDITH TOTTEN *et al.* Appellants, *vs.* HOWE TOTTEN *et al.* Appellees.

*Opinion filed June 16, 1920—Rehearing denied October 6, 1920.*

1. DEEDS—*whether deed is to be taken as a mortgage depends on intention of parties at time of execution.* The question whether a deed which is absolute in form is to be taken as a mortgage depends upon the intention of the parties at the time of its execution.

2. SAME—*what evidence is admissible to prove a deed was intended as a mortgage.* Parol evidence is admissible to prove that a deed absolute in form was intended to be a mortgage, and such evidence includes the preliminary negotiations and papers leading up to the transaction, the statements of the parties at and after the execution of the instrument, and any pertinent matters which tend to prove the real intention and understanding of the parties and the true nature of the transaction.

3. SAME—*that a deed was intended to be a mortgage need not be proved by uncontradicted or positive evidence.* The rule that the burden is on the party asserting a deed was intended to be a mortgage to show that fact by clear proof does not mean that there shall be no conflict in the testimony on the question, but it is sufficient if the evidence of intention to make the instrument a mortgage be clear and convincing, even though conflicting.

4. SAME—*what facts tend to prove deed was intended to be a mortgage.* The facts that the grantor in a deed has remained in possession and control of the property for many years after the conveyance and has paid taxes thereon tend to show that the deed was intended to be a mortgage.

5. SAME—*what is sufficient proof that deed was intended as a mortgage.* Evidence that a deed was given by the grantor to his uncle to prevent foreclosure of a trust deed and to keep the property in the family; that the grantee in a subsequent statement included the amount advanced to raise the incumbrance among other loans made to the grantor, giving credit for the amount re-paid; that the grantor remained in possession for twenty years without paying rent and without any assertion of title by the grantee or his heirs except to place the deed on record, is sufficient proof that the deed was intended as a mortgage although the grantor was not required to pay any interest on the loan.

6. SAME—*when statements of widow of grantee are admissible to prove deed was intended to be a mortgage.* Where the question whether a deed absolute in form was intended as a mortgage is the

issue in a suit for partition to which the widow of the grantee is a party in interest, statements in her letter, after her husband's death, to a real estate agent in whose hands she was about to put the property for sale, are admissible to prove the amount paid by her husband for the deed was intended to be a loan to the grantor.

7. SAME—*inadequacy of consideration tends to prove deed was intended to be a mortgage.* Inadequacy of consideration at the time the instrument was made can be taken into consideration in deciding whether a deed was intended as a mortgage.

8. SAME—*when deed cannot be held to secure former indebtedness.* Where a deed is given to secure a particular loan, which is expressed as a consideration, and does not mention any prior indebtedness, it cannot be held as security for prior loans.

9. LIMITATIONS—*equity will not apply Statute of Limitations if its operation is unjust.* The Statute of Limitations is a purely legal as distinguished from an equitable defense, and although courts of equity will ordinarily act in obedience and in analogy to said statute, yet they will also, in proper cases, interfere to prevent the bar of the statute where it is inequitable and unjust.

10. LACHES—*when equity will be slow to apply the doctrine of laches.* A court of equity will be slow to apply the doctrine of *laches* when there has been no change in the situation of the parties since the execution of the instrument which fixes their status.

11. INTEREST—*interest is allowable only when authorized by statute.* Interest is only allowable when authorized by statute, and the mere absence of an agreement for a loan with interest does not make the statute apply and require interest before the debt falls due or demand is made for payment.

12. SAME—*when interest will not be required of grantor in deed taken as a mortgage.* Although a deed is declared to have been intended as a mortgage the grantor will not be required in equity to pay interest where the loan was manifestly given for the purpose of assisting in the support and care of relatives of the grantee, who in his lifetime never considered it an interest-bearing debt and never demanded rent of the grantor, who remained in possession of the premises and assisted in maintaining it as a home for the relatives for whose benefit the loan was made.

CARTWRIGHT, C. J., and DUNN and THOMPSON, JJ., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. MERRITT W. PINCKNEY, Judge, presiding.

LESLIE A. NEEDHAM, and MORRIS ST. P. THOMAS, for appellants.

·BURRY, JOHNSTONE & PETERS, for appellee Harry Totten.

Mr. JUSTICE CARTER delivered the opinion of the court:

Appellants filed a bill in the circuit court of Cook county in July, 1917, against their brother, Howe Totten, and others, for a partition of certain real estate in the village of Winnetka, in said county. Harry Totten and his sister, Melissa Susan Totten, filed an answer, and Harry Totten filed a cross-bill claiming certain rights in the property. After the pleadings were settled the matter was referred to a master, who heard the evidence and recommended that th original bill be dismissed and that Harry Totten be allowed to redeem the property under certain conditions. On a hearing before the court the chancellor in the main sustained the recommendations of the master but changed the amount that Harry Totten should be required to pay in order to redeem, finding that he should be permitted to redeem within ninety days after the entry of the decree on the payment to Enoch Totten's children of $3555.18, or, if the case was appealed, by paying that sum within ninety days from the final order of the Supreme Court. From that decree this appeal has been prayed by Edith and Gerald Totten.

The evidence shows that the real estate in question was acquired by Harry Totten in different parcels about 1885; that the dwelling house situated thereon, from the date of the purchase, was used by Harry as a home for himself, his father and mother, his aunt, Susan Totten, and his sister, Melissa Susan, as long as they respectively lived, and that it was still occupied by Harry at the time of this litigation as his home; that on March 15, 1897, by warranty deed in regular form, this property was conveyed by Harry to his uncle, Enoch Totten, of Washington, D. C.; that Harry's father, Henry Totten, was a half-brother, and his mother, Jane Ramsay Totten, a half-sister, of Enoch; that his aunt Susan was a full sister of Enoch; that another

sister, Nancy Totten, lived a part of each year at this home in Winnetka; that Enoch died intestate in November, 1898, leaving him surviving his widow, Mary Howe Totten, who died in 1913, and appellants, Edith and Gerald Totten, and appellee Howe Totten, as his only children; that Henry Totten died in 1900 and Jane Ramsay Totten died in 1907; that Susan Totten, sister of Enoch, died in 1912; that Harry's sister, Melissa Susan, died during the pendency of this litigation, in 1918. The evidence also tends to show that before deeding this property to Enoch, Harry had placed a mortgage upon it for $2500 to help support the relatives living at the home in Winnetka; that a year and a half's interest was due on this loan in 1897; that Harry and the other relatives living at the Winnetka home were in somewhat straitened circumstances, their principal means of support being the earnings of Harry and his sister, Melissa, who maintained a school for children in a house adjoining the home on the premises in question; that Harry, a short time before the deed was made, had lost his position and was then out of work and in bad health; that the uncle, Enoch, was a man of considerable property and a practicing lawyer, living in Washington; that because of the straitened circumstances of the Winnetka relatives and because of his desire to assist in supporting his invalid sister, Susan, he had sent Susan $25 a month for years before his death, and thereafter his widow and children continued to do so until Susan's death, in 1912; that the other sister, Nancy, had received a like allowance from Enoch; that Enoch, because of the straitened circumstances of Harry and his immediate family, had loaned money from time to time to him before this deed was executed, beginning before 1893; that in that year the evidence shows he had loaned Harry altogether $3650; that in 1894 this indebtedness was reduced by Harry to $350; that thereafter additional loans were made by Enoch to Harry, until in March, 1897, Harry owed $1933.70; that

before this deed was executed a suit had been brought for the foreclosure of the $2500 mortgage; that Harry had consulted an attorney, who advised him that he had no defense and ought not to squander money in trying to oppose the foreclosure, but that he had "better do one of three things: First, raise money to pay interest, insurance and costs and have the suit dismissed; second, negotiate a new loan of $2900 or $3000 for a term of years and pay off this one; third, find someone who will buy the place from you and pay the debt. This loan to Andrews [the mortgagee] would mature January 27, 1899. If you can get someone to take the title in fee simple and pay off this loan, with privilege to you of re-purchasing within some fixed time, it might be feasible."

Harry's aunt, Susan, who was living with the family, wrote to Enoch at Washington stating some of the difficulties in which the Winnetka Tottens were involved with reference to the foreclosure proceedings and other obligations. Because of this letter Enoch then wrote to Harry asking what the situation was with reference to the property in Winnetka and other obligations, and on February 15, 1897, Harry wrote to Enoch as follows:

"*Dear Uncle*—Aunt Sue gave me the memorandum that you wrote out for Aunt Annie. I have turned same over to Tom McClelland, the lawyer, who can write more intelligently and explain matters better than I. He will write to-day and give you an outline, at least, as to how things stand. I am not equal to it, being sick and nervous. I supposed, up to two weeks ago, that I could avoid the greater part of this trouble, but at the critical period the party on whom I was depending disappointed me. Then I gave up and got sick. If you are in a position to pay the claim against me I will deed the property to you outright and you can hold same until I dispose of it at its value, which, when times are reasonably decent, is nine or ten thousand dollars. Just now I could not get over seven thousand for it, and not that at this time of the year. I do not want to have anything to do with figures, money transactions or anything else connected with this affair. You and McClelland can handle the whole matter. I am neither mentally nor physically capable of standing much more trouble without totally collapsing, and this is too much to think of. I do not want to bor-

row anything, neither do I want to lose my place, so if you can take it, do so, and when everything is brighter I can get out whole and not be in debt. * * * I hope you can help me. If not, I will simply have to trust to good luck and good times, which means my ability to dispose of the place before the summer is over. Give my love to all.                "Yours,            HARRY TOTTEN."

On the same day attorney McClelland wrote Enoch on the same subject, and on March 6 Enoch wrote a letter to Harry inclosing a memorandum of Harry's indebtedness to him, and saying, among other things: "I have a letter from McClelland, but he did not give all the facts I wanted and I have written him again. I do not know whether I can take up that debt in time or not." The itemized account of Harry's indebtedness, which was included, amounted to $1933.70. On March 11 Enoch sent McClelland, the attorney, a draft for $3200, with this letter: "I enclose herewith a draft on New York for $3200 to pay off the debt of Harry Totten secured on the Winnetka property. Should it fall short please furnish the balance and advise me and I shall reimburse you. Should there be more than necessary please return the excess to me. Harry is to convey all the property to me in fee. There are two parcels. Should you prepare the deed I wish that you would see that all is conveyed. It is prudent to have everything covered by the deed. Harry puts a much higher value on the property than I do. Please see that the deed is recorded and then send it to me." On the same day Enoch wrote Harry saying: "I sent McClelland $3200 and have asked him to pay off your trust deed on Winnetka property. Send me a fee simple deed to all the property." Harry thereafter executed said warranty deed heretofore referred to, on March 15, 1897, for the expressed consideration of $3200, the foreclosure decree was satisfied, the abstracts of title were brought down to date and Harry assigned the insurance policies to Enoch. March 25, 1897, Enoch wrote the following letter to Harry: "I enclose you a full account of money between us after closing up the trust deed to

Moore. McClelland sent me his account of disbursements this morning. I sent him $3200 and he returned me $111.93. He tells me the abstract shows special assessments unpaid. This had better be attended to before more costs are incurred. I hope you are all right now and will soon get under way." The account inclosed in the letter reads:

"Itemized statement of loans to Harry Totten by Enoch Totten and of the redemption of the Winnetka property by Enoch Totten:

| | |
|---|---:|
| 1891, November 16th, check.............................. | $1500.00 |
| 1891, December 12th, draft.............................. | 2000.00 |
| 1893, September 20th, demand note...................... | 150.00 |
| | $3650.00 |
| Re-paid by check............................... | 3300.00 |
| Balance ....................................... | $350.00 |
| 1894, May 14th, check................................. | 368.70 |
| 1894, September 17th, sight draft....................... | 1000.00 |
| 1895, April 19th, check................................ | 100.00 |
| 1896, October 20th, N. Y. draft........................ | 100.00 |
| 1896, November 30th, cash............................ | 15.00 |
| | $1933.70 |
| 1897, March 11th, by draft to redeem Winnetka property from sale ...................................... | 3200.00 |
| 1897, March 11th, to Moore, trustee, for formal release after redemption .............................. | 3.25 |
| 1897, March 11th, to Merchant's Nat. Bank on a/c N. Y. draft ....................................... | .86 |
| 1897, March 11th, to abstract makers for continuation showing satisfaction of decree and title in E. T... | 15.60 |
| Total................................... | $5153.41 |
| 1897, March 11th, check from McClelland for balance due E. T. ....................................... | 111.93 |
| Total due from Harry Totten................... | $5041.48" |

The evidence shows that Harry Totten continued in possession of the property after the date of the deed, March 15, 1897, and was at the time of the trial of this case in the circuit court still in possession and occupying it as his home; that no demand was made by Enoch in his lifetime or by any of his heirs-at-law or next of kin for the repayment by Harry of any of the sums of money borrowed from Enoch, and no interest was ever demanded or ever paid by Harry to any party on account of said loan, and

that no rent was ever demanded or paid for the premises to Enoch or any of his heirs or next of kin subsequent to March 15, 1897; that the taxes on the Winnetka property for the years 1897 to 1901, inclusive, were paid by Enoch or his estate, the total amount for those five years aggregating $467.11; that the taxes for the years after that, until the beginning of this litigation, were paid by Harry.

The conveyance from Harry to Enoch Totten was an ordinary short-form warranty deed, which on its face purported to convey a fee simple title. The decree of the circuit court held that the loans made before the execution of this deed and the payment for the redemption of the mortgage just before said deed was executed were made by Enoch for the purpose of maintaining a home for the Totten family at Winnetka and that it was not intended that such loan should draw interest; that while no time was specified for the payment of the loan and there was no express agreement between the parties as to its maturity, the loan did not become due until demand was made for it; that the deed of March 15, 1897, by Harry to Enoch was not a conveyance absolute but a conveyance by way of mortgage as security for the amount of $3088.07 so advanced by Enoch as a loan to Harry, and that on the payment by Harry to the appellants, Edith and Gerald Totten, and appellee Howe Totten, of the sum of $3088.07, together with the sum of $467.11 advanced for taxes, Harry will be entitled to a re-conveyance from Edith, Gerald and Howe Totten, the heirs-at-law of Enoch, of the legal title to the Winnetka property.

Section 12 of chapter 95 of our Revised Statutes provides that every deed conveying real estate which shall appear to have been intended as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage, and parol evidence will be admitted to show that it was intended to be a mortgage. (*Ruckman* v. *Alwood,* 71 Ill. 155.) The burden of proof

rests upon the one asserting a deed absolute in form to be a mortgage to show that fact by clear, satisfactory and convincing proof. *Deadman* v. *Yantis,* 230 Ill. 243; *Rankin* v. *Rankin,* 216 id. 132; *Novak* v. *Kruse,* 288 id. 363.

Counsel for appellee Harry Totten claim, first, that the money advanced by Enoch Totten to save the homestead to the family was intended as a sort of contribution to assist in supporting the Winnetka family, probably never to be re-paid, and that the title was transferred to Enoch, the strong financial member of the family, simply to make sure it would be preserved as a home for the family, and that the property should have been turned over to Harry and his sister without the payment of anything on their part; second, if Harry's warranty deed prevented such return of the property because there was no express trust, then they argue that the same result is arrived at by applying the Statute of Limitations, since it is claimed that he was in adverse possession of the premises for more than twenty years after the execution of the deed; third, they insist that if neither of these positions can be sustained, then, at the most, the warranty deed from Harry to his uncle was only meant to secure the amount involved in taking up the mortgage debt at the time the deed was executed. They concede that the first two claims are inconsistent with the third, and, at the last, place their sole reliance on the finding of the decree that the deed was not an absolute conveyance but was given as a mortgage to secure the payment of the loan, so that we will not give any serious consideration to their first two claims and shall devote this opinion to a consideration of the question whether or not the record sustains this last position.

There can be no question that a deed takes effect from its delivery and that its character at the time of such delivery becomes fixed as of that time. (*Bearss* v. *Ford,* 108 Ill. 16.) The question whether a deed which is absolute in form is to be taken as a mortgage depends upon the

intention of the parties in that regard at the time of its execution. This intention may be found from the papers themselves or by the aid of extraneous evidence, which, when clearly ascertained, will govern the decision. (27 Cyc. 1007.) "Parol testimony is admissible to show a conveyance in form absolute or on condition to be a mortgage, not only as between the parties and their successors but also as against one who derived his title from the grantee without paying any valuable consideration therefor." (19 R. C. L. 254.) "The gist of the inquiry in cases of this class is, what was the purpose for which the deed was executed? And it will be found by reference to the cases that every fact or circumstance tending to illustrate the purpose and intent of the parties is receivable as evidence." (*Darst* v. *Murphy*, 119 Ill. 343.) "Whether any particular transaction does * * * amount to a mortgage or to a sale with a contract of re-purchase must to a large extent depend upon its own special circumstances, for the question finally turns, in all cases, upon the real intention of the parties as shown upon the face of the writings or as disclosed by extrinsic evidence. * * * If there is an indebtedness or liability between the parties, either a debt existing prior to the conveyance or a debt arising from a loan made at the time of the conveyance or from any other cause, and this debt is still left subsisting, not being discharged or satisfied by the conveyance, but the grantor is regarded as still owing and bound to pay it at some future time, so that the payment stipulated for in the agreement to re-convey is in reality the payment of this existing debt, then the whole transaction amounts to a mortgage, whatever language the parties may have used and whatever stipulations they may have inserted in the instruments." (3 Pomeroy's Eq. Jur.— 3d ed.—sec. 1195.) The preliminary negotiations leading up to the transactions, as well as the statements of the parties at and after the execution of the instrument, may be admitted in evidence, although there is not entire har-

mony in ruling on this question. "However, the better
doctrine, on both reason and authority, seems to support the
view that such evidence may of itself be sufficient for that
purpose if it proceeds from a trustworthy source and is
unambiguous in its import. It is important to note here
that as the ultimate and essential point to be determined
in every case in which it is sought to convert an absolute
instrument of transfer into a mortgage is the intention of
the parties at the time when the instrument was executed,
their subsequent statements are relevant evidence only in so
far as they have a bearing on that intention." (19 R. C. L.
257.) In determining whether a deed absolute on its face
was intended to be a mortgage the court is not restricted
to any particular kind of evidence but may take into consid-
eration almost any pertinent matters which tend to prove
the real intention and understanding of the parties and the
true nature of the transaction in question. (27 Cyc. 1019.)
While there can be no question that the burden of proof
rests upon the party asserting that an instrument in form
a deed is, in fact, a mortgage and was so intended by the
parties, yet that does not necessarily mean that there shall
be no conflict in the testimony on the question. Positive
evidence of the intention is not required. It is sufficient if
the evidence of the intention to make the instrument a
mortgage be clear and convincing, even though conflicting.
(8 Ency. of Evidence, 718, and authorities cited; *Hartley's
Appeal,* 103 Pa. St. 23.) The fact that the grantor in a
deed absolute in form has remained in possession of the
property so conveyed and controlled the property after the
conveyance is evidence tending to show that the transaction,
in fact, was a mortgage, as is also the payment of taxes
by the grantor after the conveyance. (27 Cyc. 1014, 1015.)

Either the $3200 sent by the uncle, Enoch, to Harry
through the attorney to prevent the foreclosure of the mort-
gage on the Winnetka property was sent as a loan, to be
secured by the deed as a mortgage, or it was sent as a part

payment on the purchase price for the property. Counsel for appellees argue that it was a loan, and it was so held by the trial court. Counsel for appellants argue just as earnestly that it was a sale with the privilege of re-purchasing, and that the instrument was in no sense a mortgage.

Counsel for appellants argue that the fact that shortly after the execution of the deed Harry assigned the two insurance policies to his uncle, styling himself the "late owner" and his uncle the "present owner," is strong indication that the transaction was a sale, as is also the fact that until this suit was brought (they argue) Harry never claimed the deed was a mortgage and never offered to redeem it,—in fact never made any such claim until he filed his cross-bill; and the fact, also, that he never paid or offered to pay the supposed debt to his uncle, either principal or interest, but treated the original debt of $1933.70 and the subsequent debt of $3088.07, incurred when the deed was made, as having been extinguished by such conveyance. They also argue that their position is shown to be right by the testimony of witness Moir that as late as 1915 Harry told him over the 'phone that he did not own the property; that it was owned by relatives in the east; also by the testimony of attorney McClelland that Harry told him more than once that he was expecting to buy the property back; that all the other facts and circumstances shown in the record are consistent with this conclusion. Counsel for appellees argue just as earnestly that none of these facts urged by counsel for appellants are conclusive; that all the evidence in the record is much more consistent with the theory that it was the intention to make this instrument a mortgage; that the argument of counsel for appellants as to the assignment of the original insurance policies is fully answered and overcome by the fact that after the expiration of the original policies Harry re-insured the property in his own name; that the force of the argument that Harry never claimed the deed was a mortgage until about the time these

294- 6

proceedings were instituted is fully met by all the surrounding facts and circumstances of the case, and conclusively by the fact that no one ever questioned that it was a mortgage or attempted to ask for rent of the premises or any income therefrom; and the fact Enoch and his family allowed this money, loaned or invested, to stand for twenty years without demanding interest while Harry was in possession of the premises, clearly proves that it was understood that Enoch had made the loan to Harry for the purpose of helping him out of his difficulties, intending to let him have a deed to the property when he should pay the money back without interest, if he should ever be able to do so. They also argue that the testimony of the witness Moir as to Harry admitting that he did not own the property is very unsatisfactory and was denied by Harry; that Moir's testimony shows that he did not know to whom he was talking over the telephone; that he admitted that later on, in a personal conversation, Harry told him he thought he owned the property.

Counsel for appellees argue that the testimony of attorney McClelland was wrongly admitted in evidence and should not be considered; that the testimony upon which counsel for appellants rely was a confidential communication between attorney and client and could not be admitted without the waiver of his client, Harry Totten, and that this waiver was refused. (*People* v. *Barker,* 56 Ill. 299.) Even if it be conceded that the testimony of McClelland was properly admitted, we find, reading it all together,— both his letters at the time of the transaction and his oral testimony,—that it carries very little weight in supporting the contention of appellants. Some of his letters written at or about the time of the transaction clearly indicate that he thought the property was to come back to Harry upon his reimbursing the estate, and because of that fact he attempted to collect the fee from Harry for the work that he had done in connection with the transaction.

There is merit in the argument of counsel for appellees that extracts from the correspondence between Harry and Enoch Totten,—especially from the letters and inclosures of Enoch,—strongly support the claim of appellees that the balance of the $3200, or $3088.07, was sent to purchase the mortgage then on the property and not to purchase the property. Enoch said in his letter of March 11 to attorney McClelland, among other things: "Should it [the $3200] fall short please furnish the balance and advise me and I shall reimburse you. Should there be more than necessary please return the excess to me." Two weeks later, inclosing a full statement of the account of the transactions between them to Harry, he headed that statement as follows: "Itemized statement of loans to Harry Totten by Enoch Totten and of the redemption of the Winnetka property by Enoch Totten," and then he closed with this statement: "Total due from Harry Totten." In this statement are shown all the loans that he made to Harry in November, 1891, including those that were practically paid off in 1893. There can be no question that before the $3088.07 payment was made the other payments were loans made to Harry, and Enoch in this statement includes this $3200 as a loan, the same as all the other items, and the statement shows conclusively that he considered all this money still due from Harry even though the deed had been executed and recorded, thus bringing this clearly within the rule requiring proof to show that the instrument is a mortgage rather than a deed, as set forth in 3 Pomeroy's Eq. Jur. (3d ed.) sec. 1195, heretofore quoted. The amount loaned just before the execution of the deed was a definite amount, $3200, less the $111.93 returned by attorney McClelland, or a balance of $3088.07, as found by the decree of the court, and this was included in the statement among the loans due from Harry.

Almost every conceivable state of facts legitimately illustrative of the transaction has been held competent evidence in attempting to show the intention of the parties in

making the instrument. (*Darst* v. *Murphy, supra.*) During all the years following the execution of the deed Harry Totten remained in possession without interruption, rent free and without paying any interest, and after the year 1902 he paid all the taxes on the place, and during all this time Enoch Totten, and after his death his heirs, made no claim or assertion of title other than to place the deed on record. This is held in *Darst* v. *Murphy, supra,* an indication that an instrument in the form of a deed is to be considered a mortgage. It seems obvious that both parties, from their actions with reference to this transaction after the execution of the deed, understood the transaction was a loan rather than a purchase and sale. The widow of Enoch Totten, Mary Howe Totten, on July 18, 1909, wrote a letter to the real estate man in whose hands she was thinking of placing the Winnetka property for sale, and in speaking of the price she hoped to get for the property, said, among other things, "So that when it was sold there would be enough left after paying the debt to the estate (without interest) to buy a home for the Winnetka family." She was a party in interest. She derived her title through the grantee, Enoch Totten, without paying any valuable consideration therefor, and her statements have a bearing on what was the intention of the parties. From her correspondence during these years as to the Winnetka property it is clear that she understood that the $3088.07 paid by her husband at the time the deed was executed was a loan and was still owed as a debt to her husband's estate by Harry Totten, and that it was intended that the remainder after paying the debt would go to buy a home for the Winnetka Tottens if the property sold for what it was worth. Inadequacy of price at the time the instrument was made is also a fact that can be taken into consideration in deciding whether an instrument is a deed or a mortgage. If the consideration named in the instrument is grossly inadequate as regards the real value of the land it will tend strongly

to show that a sale was not intended but that the transaction was intended to be treated as a mortgage. (27 Cyc. 1012.) Harry thought the land was worth $10,000, and that was the price the widow, Mary Howe Totten, put it at when placing it in the hands of the real estate man heretofore referred to, and while Enoch stated in his letter that he thought Harry valued the property entirely too high, Harry testified, without contradiction, that he had been offered $8500 for the property shortly after the execution of the deed, and we think the weight of the evidence clearly shows that it was worth more than double $3088.07.

After considering all the evidence in the record, including the correspondence between the parties and their attorney, we are of the opinion that the weight of the evidence tends more reasonably to uphold the conclusion arrived at by the chancellor in the decree that at the time it was executed the instrument was intended by the parties to be a mortgage to secure the loan of $3088.07, rather than a deed conveying a fee simple title on a purchase and sale of the property in question. While there is some conflict in the papers bearing on this question as well as in the oral testimony, we are of the opinion that the proof supporting this conclusion is clear, satisfactory and convincing. The correspondence preceding the execution of the deed and immediately following tends very strongly to support this conclusion, and the weight of the other evidence as to all the transactions, correspondence and acts of the parties thereafter tends to support the same conclusion.

Counsel for appellants argue that even if the deed be treated as a mortgage the right of redemption has expired by limitation, or, at least, by *laches;* that if this instrument be considered a mortgage the loan which it was given to secure was due immediately after the deed was made, and that Harry Totten might have filed a bill to redeem at any time after March 15, 1897, hence the Statute of Limitations would begin to run from that date; that the right to re-

deem is barred by the same lapse of time as would bar the right to foreclose, as held in *Fitch* v. *Miller,* 200 Ill. 170, and that the right of Harry to redeem from this mortgage was barred when he filed his cross-bill, in May, 1918, as he delayed more than twenty-one years after his right had accrued to redeem and enforce it. Counsel concede that the Statute of Limitations is a purely legal as contradistinguished from an equitable defense, and that although courts of equity will ordinarily act in obedience and in analogy to the Statute of Limitations, yet they will also in proper cases interfere to prevent the bar of the statute where it would be inequitable and unjust. (*Thorndike* v. *Thorndike,* 142 Ill. 450.) They further concede that while the limitation fixed by the statute is ordinarily followed in equity as a convenient measure for determining the length of time that ought to operate as a bar it is not regarded as conclusive or binding, but argue that by the rule of analogy, unless it affirmatively appears that peculiar facts exist which justify the application of some equitable exception to the ordinary rules, the Statute of Limitations will bar in equity. (*Evans* v. *Moore,* 247 Ill. 60.) They also argue that even though the Statute of Limitations strictly will not control here, the long delay amounted to *laches* which should preclude relief in a court of equity. *Fitch* v. *Miller, supra.*

Counsel for appellees concede the above rules of law but insist that under the facts and circumstances as shown in this record it cannot be said that Harry Totten was guilty of such *laches* as to deny him relief in equity; that *laches* will never be imputed to one who is under no obligation to act, and that he was being denied no right, was suffering no inconvenience, as he remained in possession of the property, and had no reason to believe that his title would be attacked; that "what constitutes an unreasonable delay depends upon the facts of the individual case; thus, *laches* will not be imputed to the grantor as long as he remains in possession without interference from the grantee;" (2 Jones

on Mortgages,—7th ed.—sec. 1093*a*;) that from the earliest time it has been the recognized doctrine in this State that *laches* will not be imputed nor will the Statute of Limitations run against one in possession of real estate. (*Mills* v. *Lockwood*, 42 Ill. 111; *Wilson* v. *Byers*, 77 id. 76; *Whitsitt* v. *Presbyterian Church*, 110 id. 125; *Parker* v. *Shannon*, 137 id. 376.) They insist that the same rule ought to be applied here as was applied by the court in *Bergen* v. *Johnson*, 21 Idaho, 619, where the court said: "This defense cannot be allowed. The instrument involved being a mortgage and the debt being payable upon demand, Johnson could have commenced an action to have the mortgage foreclosed at any time upon demand, and it was entirely within his power to have brought an action for that purpose at any time, and respondents were not, in law, required to bring an action to compel him to do so, and they are not barred by the period of the Statute of Limitations because they did not so bring an action."

In *Brown* v. *Spradlin*, 136 Ky. 703, it was held that *laches* in beginning an action to have an absolute deed declared a mortgage could not be imputed to the grantor as long as he remained in possession of the land without interference from the grantee. Furthermore, there is merit in the argument of counsel for appellees that Enoch Totten loaned Harry the money, not on account of commercial motives, as if it were a business transaction, but to assist in giving a home to some of Enoch's relatives to whose support Enoch himself was contributing; that the principal object of his assistance was his sister, Susan, who did not die until 1912, and that the motive which prompted him to help her in 1897 continued until his death and afterwards moved his wife to continue to assist in her support until Susan's death, in 1912. Therefore, under the circumstances of this case, in view of the purpose of the loan, it can not be said in equity that in the absence of a demand of any kind or nature from Enoch or his heirs, Harry was

guilty of *laches* while he was carrying out the very purpose for which the loan was made. In the present case every equitable consideration requires that Harry, who received this money for the purpose of maintaining the Winnetka home and who carried out this purpose throughout a long period of years, should not have *laches* imputed to him during these years while he was so carrying out that purpose and should not at this late date be dispossessed upon the ground of *laches*. Moreover, the letters of Mary Howe Totten after her husband's death with regard to this property indicated that she was in full accord with her husband's purpose in keeping this home for the relatives, and that her plan in the sale of the property was that when it was sold the debt to the estate was to be paid and that Harry was to have the remainder over and above the amount of the debt. A court of equity will be slow to apply the doctrine of *laches* when there is no change in the situation of the parties since the execution of the instrument in question. There has been none here. The evidence tends to show that there has been no material increase in the value of the property. While, perhaps, the land has increased somewhat in value the improvements thereon have certainly deteriorated. No rights of third parties have intervened. There have been no sales or assignments and no liens of judgment creditors, and the situation was exactly the same when this litigation was instituted as it was when the instrument was executed by Harry. If *laches* should be charged to Harry, why does not the same rule apply in equity to the appellants in this case? Harry was in the quiet, undisturbed possession of this property, enjoying the fruits of ownership and carrying its burdens. For years since Enoch's death appellants have been out of possession, receiving no rent from the property, paying no taxes. If the condition was not being allowed to continue with the passive consent of all the parties, was it not their duty to have moved years ago to recover possession? The argument of counsel

for appellants on this question seems to be that they have improved their own legal position in court by waiting and allowing Harry to continue in peaceful possession of the property. In view of this record appellants should not be permitted to invoke the doctrine of *laches* against Harry in their favor.

Counsel for appellants further argue that if Harry Totten is allowed to redeem, equity requires that he be compelled to pay the full amount owed by him to Enoch Totten from the date the instrument was executed; that the decree was wrong in allowing only the item of $3088.07,— the amount advanced by Enoch at the time the deed was executed,—and allowing also the item of taxes paid by Enoch or his family on the property; that the court should have allowed the sum of $1933.70, which had already been loaned by Enoch to Harry and is shown clearly by all the evidence in the record to have been due at that time. Counsel for appellees insist in answer to this argument that "the mortgagee cannot tack to his mortgage any debt not secured thereby and require its payment by the mortgagor as a condition to his right to redeem; it is presumed that the consideration recited in the mortgage is the amount of the debt;" (1 Jones on Mortgages,—7th ed.—sec. 360;) that a mortgage given to secure a particular debt, whether present or prospective, cannot be enforced as security for another and different debt; that such tacking or adding to the particular debt expressly secured by the mortgage is not permitted either on redemption or foreclosure of the mortgage; (27 Cyc. 1073;) that in the correspondence with reference to the loan of $3200 made by Enoch to Harry to redeem the property from the foreclosure sale nothing was said with reference to the deed being executed for the purpose of securing the open account or loans theretofore made by Enoch to Harry. In *Freytag* v. *Hoeland*, 23 N. J. Eq. 36, there was a somewhat similar state of facts involved. A bill was filed to redeem from a deed absolute in form

but held to be a mortgage, and it appeared that the deed had been given as security for a particular debt and that there was a prior debt owed by the mortgagor to the mortgagee. At the time the instrument was drawn nothing was said as to the prior indebtedness. The court there held that this tended to show that the instrument was not intended to secure the antecedent indebtedness; that the burden of proof was on the grantee to prove that the deed was given to secure such prior indebtedness as well as the amount then advanced, and that the proof did not show that this was the intention. The instrument here, executed on March 15, 1897, did not refer to the prior indebtedness and mentioned a particular consideration,—$3200. Under the reasoning of the authorities cited, the chancellor was justified in holding that the instrument was not intended to be given as security for the former indebtedness of Harry to his uncle, Enoch. The following authorities tend to support this same conclusion: *Fridley* v. *Bowen*, 103 Ill. 633; *Baldwin* v. *Bradley*, 69 id. 32; *Carpenter* v. *Plagge*, 192 id. 82; 1 Pomeroy's Eq. Jur. (3d ed.) sec. 387.

Counsel for appellants further argue that equity requires that the cross-complainant pay interest on the entire debt secured by this instrument if held a mortgage, from its inception to the time of redemption. "By modern decisions, interest is allowed as compensation for the use of money on the ground of some contract, express or implied." (15 R. C. L. 6.) A right to interest does not exist at common law and is only allowable here when authorized by statute. (*Fowler* v. *Harts*, 149 Ill. 592.) A promise to pay interest may be inferred from custom or circumstance, but a party not aware of the custom cannot be charged with interest. (*Rayburn* v. *Day*, 27 Ill. 46; *Ayers* v. *Metcalf*, 39 id. 307.) The master found, after hearing the witnesses with reference to this transaction and seeing the original papers filed by the parties, that "it is plain that no interest was to be paid." The finding of the master in this regard

was sustained by the chancellor. Nothing was said in any of the correspondence between Enoch and Harry Totten and attorney McClelland at the time of the execution of this instrument with reference to the payment of interest, and it is obvious from the statement of account made by Enoch to Harry that he did not charge any interest on the former loans, and it seems also plain that he did not intend to charge any interest whatever. His widow, Mary Howe Totten, in her letters after her husband's death distinctly stated that they intended to carry out her husband's plans with reference to this money advanced by him to Harry and permit the re-payment of the face of the debt without interest. All of the evidence in the record tends to support this conclusion. In the absence of an agreement for a loan with interest the statute of this State does not apply and require interest. It only provides for the payment of interest after the account becomes due, which brings us particularly to the question previously referred to, to-wit, when did this loan become due? It was made for the purpose of enabling Harry to maintain the Winnetka home. Enoch did not intend it to become due until the purpose for which it was made was accomplished. It is a fair inference from the evidence that this loan was not intended to be paid until Harry could sell the property, and therefore it would not become due until the proper time had arrived for the sale of the property. The property has not been sold, and there was no demand for the payment of the loan before the beginning of this litigation.

Counsel for appellants argue that the cross-complainant, in asking the right to redeem, should in equity be compelled to pay interest on these loans. If this loan had been an ordinary business transaction between strangers such argument might have merit, but the loan was manifestly made for the purpose of assisting in the support and care of relatives who needed financial assistance. Enoch Totten in his lifetime never considered this an interest-bearing debt or

demanded interest or rent for the premises. Clearly his wife, as long as she lived after his death, took the same view and stated that she intended to carry out her husband's arrangement and allow Harry to pay the debt without interest. Enoch's children, appellants here, never took a different position until the beginning of this litigation. If the twenty-one years' interest since the execution of this instrument conveying the legal title to Enoch be added to the amount of the loan, ($3088.07,) the principal and interest would amount to practically the entire amount of the property, and in a court of equity appellants would be permitted to accomplish the same purpose that they are attempting to accomplish by arguing that this instrument was not a mortgage but a deed. This, to us, does not seem to be equitable or in accordance with the intention of the parties.

Some other questions are raised by appellants which we do not deem it necessary to discuss or decide.

We find no reversible error in the record. The decree will therefore be affirmed.                    *Decree affirmed.*

Mr. JUSTICE DUNN, dissenting:

I do not agree with the foregoing opinion or the reasoning by which the conclusion is reached. Whatever agreement existed between Enoch Totten and Harry Totten was evidenced by the letters which passed between Harry and Enoch and the letters of the lawyer, McClelland. There were no conversations and the rights of the parties must be determined by the written evidence. It is apparent that the relations of Enoch to his relatives in Winnetka were friendly and that his conduct was influenced by his desire to help his brother and sisters and their children, but these circumstances do not change the legal effect of the writings which evidenced the agreement between Harry and Enoch. While he paid off the incumbrance on the property he took a conveyance of the title to himself, writing to Harry to send him a fee simple deed, and instructing McClelland, the attorney, that Harry was to convey all to him; that there were two

parcels, and that the attorney should see that all the property was conveyed. McClelland had written advising Harry that he had better do one of three things: either raise the money and pay off the mortgage, negotiate a new loan or find someone to buy the place and pay the debt, and suggesting that if he could get someone to take the title in fee simple and pay off the loan, with the privilege to Harry of re-purchasing within some fixed time, it might be advisable. It was the latter proposition which Harry chose, and in a letter to his uncle he stated that he did not want to borrow anything or to lose the place, "so if you can take it, do so, and when everything is brighter I can get out whole and not be in debt." In accordance with his letter which proposed that if Enoch was in a position to pay the claim of the foreclosure suit Harry would deed the property outright to him and Enoch could hold it until Harry disposed of it at its value, which Harry believed to be $9000 or $10,000, without more correspondence Enoch paid off the decree and had it satisfied and Harry conveyed the property to Enoch. Since that day Harry has never paid a cent on account of principal or·interest to Enoch or his heirs, and neither Enoch nor his heirs have ever demanded a cent of Harry for principal or interest. There was no promise by Harry to re-pay Enoch the money he might advance; no undertaking to do anything or pay any amount. At no time could Enoch have maintained an action to recover the money advanced. Harry's undertaking was only, if Enoch would pay the claim, to deed the property to Enoch outright, and that Harry did. He never agreed to do anything else. The further statement that Enoch could hold the property until Harry disposed of it at its value imposed no obligation on Harry. It did no more than reserve a privilege to him. He was under no obligation to sell or try to sell the property at an advance. The conveyance to Enoch was an ordinary short-form warranty deed, which on its face purported to convey the title to him in fee simple.

Section 12 of chapter 95 of the Revised Statutes provides that every deed conveying real estate which shall appear to be intended only as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage, and parol evidence is admissible to show that it was intended to be a mortgage. (*Ruckman* v. *Alwood,* 71 Ill. 155.) The burden is upon the one asserting a deed absolute in form to be a mortgage to show that fact by proof which is clear, satisfactory and convincing. (*Deadman* v. *Yantis,* 230 Ill. 243; *Rankin* v. *Rankin,* 216 id. 132; *Heaton* v. *Gaines,* 198 id. 479.) The kind of evidence which is admissible for that purpose is that of facts and circumstances of such a nature that the law implies from them the relation of mortgagor and mortgagee. The relation must arise out of the transaction itself, and must be paramount to and independent of the terms of the deed as well as of any understanding between the parties at the time it was executed. (*Sutphen* v. *Cushman,* 35 Ill. 186; *Lindauer* v. *Cummings,* 57 id. 195; *Knowles* v. *Knowles,* 86 id. 1.) Since deeds take effect from their delivery, the character of an instrument as a deed or mortgage becomes fixed at that time. (*Bearss* v. *Ford,* 108 Ill. 16.) To fix upon a deed absolute in form the character of a mortgage it must be shown to have been intended as a security in the nature of a mortgage, and to hold such deed a mortgage, a valid, subsisting obligation must be shown, the performance of which the deed was intended to secure. "There must be a continuing valid indebtedness secured by it which may be enforced * * * in an action at law or it is not a mortgage, whatever else it may be." (*Batcheller* v. *Batcheller,* 144 Ill. 471.) Where there is no debt there can be no mortgage. (*Caraway* v. *Sly,* 222 Ill. 203; *Rue* v. *Dole,* 107 id. 275.) A mere option to re-pay the purchase money and receive a conveyance of the property will not convert a conveyance absolute in terms into a mortgage. (*Caraway* v. *Sly, supra.*) Nor will an agreement by the

grantees in a deed authorizing a sale by the grantor of the property conveyed at a fixed price and the retention by the grantor of any sum received in excess of such price. *Friend v. Beach,* 276 Ill. 397.

The conveyance by Harry Totten was in March, 1897. Enoch Totten died in November, 1898. No act or word of his was shown qualifying in any manner the agreement evidenced by the correspondence of Enoch, Harry and Mc-Clelland which occurred at the time the deed was made. Considerable stress is laid upon the conduct of his widow and children in permitting Harry and his family to occupy the premises for twenty years after Enoch's death, paying the taxes and in contributing a certain sum monthly to their support, but these acts of kindness on their part cannot be considered as evidence of Enoch's intention at the time he took a conveyance of the property. Since the deed was absolute on its face it apparently vested Enoch with the ownership of the property in fee simple, and this title is perfect unless set aside. There is no legitimate evidence,—much less clear and satisfactory evidence,—inconsistent with the deed's being an absolute conveyance of the fee, as it purports to be, and the transaction evidenced by the writings, taken most favorably to the appellees, indicates no more than that Harry reserved the right to re-purchase the premises within a reasonable time.

In my judgment the decree should be reversed, the cross-bill should be dismissed and a decree of partition should be entered in accordance with the prayer of the bill.

Mr. CHIEF JUSTICE CARTWRIGHT, also dissenting:

I agree with the reasoning and conclusion of Mr. Justice Dunn.

Mr. JUSTICE THOMPSON, also dissenting:

The question here arises out of facts peculiar to the circumstances surrounding this particular transaction. While the authorities cited in the opinion of the court and in the

above dissenting opinion serve as guides in solving the question, I have found no decision that can be said to be controlling in reaching the correct conclusion in this case. The decision here must rest on the facts and circumstances peculiar to this case. These facts and circumstances are set out fully in the opinion and there is no reason for my repeating them. I am inclined to agree with the decision of the court in so far as it holds that appellee Harry Totten has the right to redeem, but I feel that equity requires him to pay the entire indebtedness evidenced by the statement submitted when this transaction was concluded. The consideration expressed in the deed is not the true consideration, and it can just as reasonably be held that the deed was given to secure the entire debt of $5041.48 as to hold that it was given to secure the single item of $3088.07. Since Harry seeks relief in a court of equity he should be compelled to do equity.